ESTATE OF Joseph P. KOSOW, Deceased.

Eleanor C. KOSOW, Personal Representative, Petitioner– Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent– Appellee.

No. 93–4307.

United States Court of Appeals, Eleventh Circuit.

Feb. 28, 1995.

Lester G. Fant, III, John Wester, Nina B. Finston, Carter G. Phillips, Sidley & Austin, Washington, DC, for appellant.

Gary R. Allen, Joy L. Pritts, Loretta C. Argrett, Asst. Atty. Gen., Ann B. Durney, Bridget M. Rowan, Dept. of Justice, Tax Div., Washington, DC, for appellee.

Before COX, Circuit Judge, FAY, Senior Circuit Judge, and CARNES *, District Judge.

* Honorable Julie E. Carnes, U.S. District Judge for the Northern District of Georgia, sitting by desig- nation.

CARNES, District Judge:

The Estate of Joseph Kosow has appealed the Tax Court's decision to disallow a deduction for a claim that was made against and paid by the estate. In particular, the Tax Court held that the estate had failed to prove that the agreement by the deceased that gave rise to the claim was an agreement supported by full and adequate consideration, as required by law. We disagree and hold that the Tax Court erred in its determination.

## I. BACKGROUND

Joseph P. Kosow ("Joseph" or the "Decedent") and his first wife, Barbara Kosow Sack ("Barbara"), married in 1938. The marriage produced two children, Marvin and Jeffrey, who were born in 1940 and 1945, respectively. During the course of the marriage, Joseph entered into several successful business ventures. First, with a loan guaranteed by Barbara's father, Joseph established a luggage manufacturing business. Due in part to his ability to obtain government contracts to manufacture duffle bags during World War II, the luggage business proved to be very profitable. As his luggage business prospered, Joseph invested in other ventures, including a shoe manufacturing business, which also proved to be quite profitable. By 1948, Joseph had largely disassociated himself from the manufacturing businesses and was primarily engaged in financing activities through the Industrial Finance Corporation, a corporation of which he and his brother were equal shareholders.

Joseph's business ventures permitted him and his family to enjoy a very comfortable standard of living. Purchasing a large house in an exclusive neighborhood in Brookline, Massachusetts in 1943, the Kosows furnished their home in an opulent manner.[1] The couple dressed in expensive clothes and Joseph showered Barbara with jewelry and furs. The couple owned two cars, one of which was a Cadillac that was regularly replaced. They also belonged to a number of exclusive country and social clubs and entertained extensively. The family retained the services of a live-in nanny, a housekeeper, and an additional employee to assist the other domestic employees with heavier tasks from time to time.[2] In addition, the Kosow children attended private schools and summer camp and the family took regular vacations in New Hampshire and Florida.

Although Joseph had sole responsibility and control for the family's finances, he imposed no limits on Barbara's spending, giving her access to a checking account for household expenses and liberally providing additional funds whenever Barbara requested them. Joseph paid all the major bills as they came due and Barbara was not aware of any reliance on credit to sustain their standard of living. Joseph was very secretive about his business ventures, however, and Barbara had no knowledge regarding the level of profits generated by the businesses or the value of the assets employed in the businesses.

Notwithstanding his secretiveness about his business dealings, Joseph was known to boast about his material wealth. For example, during the relevant time period, Joseph told his brother Daniel that he was a millionaire. Further, at trial, Joseph Kosow's accountant speculated that Joseph may have been a millionaire in 1951, although the accountant could not be precise or certain about the extent of Joseph's wealth and

---

**1.** Although the record does not provide great detail with regard to the design of the home, the IRS concedes that it was quite large and was located in "an affluent Boston suburb." (Br. of Appellee at 6.) The record does indicate that the home contained three stories plus a basement, which had been finished and fully equipped as a private gym. Moreover, the home was large enough to accommodate the Kosows and at least one domestic employee. Joseph Kosow revealed little information to Barbara about particular details of the family finances and, accordingly, the record does not reveal the value of the home

in 1951 or even what the Kosows paid for it in 1943.

**2.** The IRS notes that the nanny and housekeeper were paid at a weekly rate of $25 and $6 respectively. The record does not reflect, however, whether these salaries were paid in 1943 or 1951 or sometime between. At any rate, the salaries of just these two employees amounted to approximately $125 per month, exclusive of any taxes paid by the Kosows and exclusive of the living expenses of at least the nanny who lived in the Brookline house with the family.

based his observation in large part on Joseph's representations. Indeed, the testimony suggests that there may have been an element of exaggeration in Joseph's boasting.

After the birth of their second son, the Kosows experienced marital difficulties and, in late 1950, they separated. At the time of their separation, Joseph established a separate residence in an apartment in Cambridge, Massachusetts.[3] After arm's length negotiations, in which each spouse was represented by legal counsel, Joseph and Barbara entered into a settlement agreement in 1951 that addressed all of their property and support rights, as well as child custody issues (the "1951 Settlement Agreement"). Further, the 1951 Settlement Agreement provided that in the event either of the parties subsequently filed for divorce, the settlement agreement would be accepted in lieu of any claim for support, maintenance or alimony, and that the agreement would be incorporated into the terms of any divorce decree.

As to the terms of the 1951 Settlement Agreement, it required Joseph to pay Barbara $100 per week in spousal support and $80 per week in child support for the couple's two sons, as well as the cost of summer camp and vacation for the children. It further provided that Barbara, who continued to live in the Brookline house, which was titled in her name alone, would be awarded the furniture and household effects. A June 13, 1952 Amendment to the 1951 Settlement Agreement also provided that Joseph would pay $1,100 per year for both sons to attend private day school until 1955.

Of greatest relevance to this litigation, Barbara expressly released Joseph from all claims and demands, both in law and equity, and agreed to make no claim or demand other than as provided in the agreement. Further, notwithstanding the young ages of herself and the Kosow children, Barbara waived all rights later to seek modifications of the support award due to changed circumstances. Barbara testified that the amount of these support payments were less than her

living expenses had been during the marriage and, in fact, she had to obtain financial assistance from her father in order to maintain the household. In return for Barbara's agreement to accept this lower level of support payments, Joseph agreed to provide a college education for the children and to leave two-thirds of his estate in a trust for the benefit of his two sons and any children from any subsequent marriage.

According to Barbara, instead of seeking additional support payments in the face of Joseph's protestations, she specifically bargained for Joseph's promise to provide for the children in his will. Indeed, the IRS has conceded that Barbara waived any other claims she might have possessed for alimony or a share of Joseph's assets in exchange for his promises under the agreement. Moreover, the IRS has stipulated that the 1951 Settlement Agreement was a *bona fide,* arm's length agreement, and not a subterfuge to evade taxes by disguising a bequest to the children as a claim on the estate. Indeed, when the agreement was executed, Joseph was only 34 years old and in good health, with a life expectancy of 30 years, Barbara was 33 years old with a similar life expectancy, and the children were 10 and 6 years old.

On October 14, 1952, Barbara filed for divorce in the Circuit Court for Dade County, Florida, and the court issued a final decree of divorce a few days later. The decree ratified and incorporated the 1951 Settlement Agreement, as amended by the parties in 1952. Shortly thereafter, Barbara married Benjamin Sack and Joseph married Eleanor DelBianco. Joseph and Eleanor had three children during the course of their marriage: Kelley, Candy and Curt Kosow.

Over thirty years later, in 1984, Joseph transferred virtually all of his property to his second wife, Eleanor. A month later, Joseph Kosow died. Contrary to the terms of the 1951 Settlement Agreement, Joseph's Last Will and Testament expressly excluded Marvin and Jeffrey from sharing in the estate.

---

**3.** The divorce petition alleges that Joseph also had maintained an apartment in New York since 1947 purportedly because he needed an additional residence to conduct business when he was away from home. *See Kosow v. Kosow,* No. 153759 (Cir.Ct. of Dade County, Fla. filed Oct. 14, 1952).

Filing suit in the Circuit Court for Dade County, Florida in 1985, Marvin and Jeffrey Kosow alleged that their father had breached that portion of the 1951 Settlement Agreement wherein he had promised to leave two-thirds of his estate to his children. In 1989, the Estate reached a tentative settlement with Jeffrey and Marvin that called for the payment of $2 million to each son in settlement of each son's claim on the Estate. Thereafter, the Dade County Probate Court issued an order authorizing execution of the settlement agreement between the Estate and the sons.

## II. PROCEDURAL HISTORY

On February 24, 1989, the District Director of Internal Revenue, Ft. Lauderdale, Florida, issued a "Notice of Deficiency" based upon a determination of deficiencies in the estate tax reported to be owed by the Estate. While the Notice of Deficiency initially sought an increase in tax of over $13 million dollars, the IRS has since stipulated that the only deficiency at issue results from the deduction by the Estate of the $4 million dollar payments to Marvin and Jeffrey Kosow.

Thereafter, the Estate filed a timely Petition with the United States Tax Court seeking a redetermination of the deficiencies set forth in the Notice of Deficiency. Trial was held before the Honorable Meade Whitaker on December 11, 1990. The Estate argued that a deduction for the settlement payments made to Marvin and Jeffrey was an appropriate deduction for a bona fide claim that was contracted for an adequate and full consideration, pursuant to the pertinent provision of the Internal Revenue Code, 26 U.S.C. § 2053(c)(1)(A). The IRS stipulated that the 1951 agreement in which the Decedent agreed to leave a portion of his estate to Marvin and Jeffrey was a *bona fide*, arm's length divorce settlement and not a subterfuge. Accordingly, the only issue disputed at trial was whether Joseph's promise to make bequests to his two sons was supported by full and adequate consideration, in money or money's worth, in the form of forgone marital rights by Barbara.

The IRS contended at trial that the marital rights given up by Barbara Kosow did not satisfy the statutory standard for "consideration" in that the Estate had not proven with sufficient precision the present monetary value of the promises exchanged in 1951. In a brief memorandum order, the Tax Court held that "the facts before us are insufficient for us to make a finding of 'adequate and full consideration.'" Thereafter, on December 22, 1992, the Tax Court entered an order reflecting a deficiency resulting from the disallowance of the deduction for the $4 million payments to Marvin and Jeffrey Kosow.

## III. STANDARD OF REVIEW

■ The ultimate issue in this case concerns whether the Estate has proven the existence of "full and adequate" consideration for the promise made by the deceased to provide in his will for Marvin and Jeffrey Kosow, upon which promise the claim against the Estate was based. Before reaching that ultimate issue, however, the parties disagree as to the standard used by the Tax Court to determine that fact. The Estate argues that the Tax Court applied an incorrect legal standard and, thus, that this court must employ a *de novo* standard of review, at the outset, to determine the appropriate legal standard. Specifically, the Estate argues that the Tax Court implicitly applied a 1971 Revenue Ruling that requires a dollar-for-dollar matching of consideration given by the parties to an agreement, in order for the payments made pursuant to such an agreement to be considered as adequate consideration. *See* Rev.Rul. 71–67, 1971–1 C.B. 271 (1971).[4] In arguing that this is an incorrect legal standard, the Estate contends that no court has required such specificity in order to conclude that an agreement was supported

---

4. An IRS ruling is not the product of notice and comment procedures, but is merely an opinion of an IRS attorney. *Stubbs, Overbeck & Assocs., Inc. v. United States*, 445 F.2d 1142, 1146–47 (5th Cir.1971). While taxpayers may assert their holdings as a shield, Rev.Proc. 89–14, § 7.01(4), (5), 1989–1 C.B. 814, 815 (1989), they do not have the effect of law and are not binding on the courts. *Stubbs*, 445 F.2d at 1146–47.

by full and adequate consideration [5] and, moreover, that requiring such precision in an agreement made over 40 years ago is clearly unreasonable.

The IRS, on the other hand, contends that the Tax Court did not require a dollar-for-dollar matching of considerations and thus, did not apply the legal standard attributed to it by the Estate. The IRS argues that, instead, the Tax Court based its disallowance of the deduction solely on its conclusion that the Estate had not produced evidence that Barbara Kosow gave *any* consideration in exchange for Joseph's promise to leave two-thirds of his estate equally to all of his children, which failure would necessarily mean that the Estate had not demonstrated "adequate and full consideration." Thus, the IRS argues that the Tax Court applied the standard sought by the Estate and that, accordingly, this Court's standard of review is limited to reviewing for clear error the Tax Court's essentially factual conclusion that "full and adequate consideration" did not support the promise on which the claim was based.

■ As the IRS does not now argue that Revenue Ruling 71–67 governs the outcome of this case, the Court will not address its applicability.[6] Thus, the Court will review for clear error the Tax Court's factual deter-

mination that Barbara Kosow did not give "adequate and full consideration" in exchange for Joseph Kosow's reciprocal promises in the 1951 Settlement Agreement. *See Sherman v. United States*, 462 F.2d 577, 578 (5th Cir.1972) [7] (determination that "full and adequate consideration"—the relinquishment by wife of marital rights—supported deceased husband's agreement to pay monthly support to wife until her death or remarriage was a finding subject to a clearly erroneous standard of review).

## IV. DISCUSSION

### A. *Statutory Framework.*

Section 2001 of the Internal Revenue Code of 1954 [IRC] imposes a tax on a decedent's "taxable estate." The taxable estate is equal to the value of the "gross estate," which consists of the value of all property owned by the taxpayer upon death, less applicable deductions enumerated in IRC §§ 2053 through 2056. *See* 26 U.S.C. §§ 2031, 2051. Section 2053(a) allows a deduction from the gross estate for administrative and funeral expenses, debts or claims against the estate, and taxes imposed by a state or foreign country. The deduction for "claims against the estate" takes account of those debts or personal obligations existing at the time of the decedent's death. *See* 26 U.S.C.

5. Application of Revenue Ruling 71–67 would require a detailed assessment of the support award to which Barbara would have been entitled in 1952 if she had sued Joseph for support, rather than settling out of court. The ruling requires an exact calculation and comparison of precisely what each party gave up and precisely what each party received under the agreement in present value terms, valued as of the time of the agreement. Thus, under this Ruling, to show that Barbara Kosow would have been entitled under Massachusetts law to a greater support award than that to which she agreed, the Estate would have had to produce detailed evidence of the family's standard of living and its costs. Further, the Estate would have had to produce detailed evidence of Joseph's net worth, annual income, and financial resources at the time of the separation.

6. The Court does note, however, that the IRS is unable to cite *any* circuit court cases applying Revenue Ruling 71–67. At various points in this litigation, however, the IRS has relied upon three reported Tax Court cases applying the ruling. In

two of the cases, however, the Tax Court concluded that the estate had met the evidentiary requirements of the revenue ruling and granted the deductions. *See Estate of Fenton v. Commissioner*, 70 T.C. 263, 1978 WL 3255 (1978); *Estate of Scholl v. Commissioner*, 88 T.C. 1265, 1987 WL 49326 (1987). Moreover, it appears that the estates in these cases asserted the ruling as a safe harbor and thus the Tax Court applied the standard because the parties agreed that it applied. In the third case, the Tax Court applied the ruling and denied the deduction. *Estate of Iversen v. Commissioner*, 65 T.C. 391, 1975 WL 3199 (1975). On appeal, however, the Third Circuit reversed the Tax Court's findings and concluded that there was adequate consideration. *Estate of Iversen v. Commissioner*, 552 F.2d 977, 985 (3d Cir.1977).

7. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit Court of Appeals handed down prior to the close of business on September 30, 1981.

§ 2053(a)(3); 26 C.F.R. § 20.2053–4 (1994). To prevent an individual from depleting his estate by transforming a bequest to a natural object of his bounty into a deductible "claim" against the estate, § 2053(c)(1)(A) limits the deductibility of "claims" founded on a promise or agreement to those agreements that were contracted *bona fide* and for adequate and full consideration in money or money's worth.[8] *Leopold v. United States*, 510 F.2d 617, 623 (9th Cir.1975).

Thus, claims against an estate can be deducted only if they:

1) are enforceable obligations of the estate under the local law of the jurisdiction probating the estate,

2) have been or will be paid by the estate,

3) were contracted for pursuant to *bona fide* arm's length negotiations, and

4) arose in exchange for adequate and full consideration, as that term has been interpreted.

In this case, the first three requirements are not in dispute. The claim was enforceable under the laws of Florida and the Dade County Probate Court approved payment of the claim in settlement of Marvin and Jeffrey Kosow's lawsuit against the Estate. The Estate has paid Marvin and Jeffrey the $4 million agreed upon in settlement of their claims. Further, the IRS has stipulated that the 1951 Settlement Agreement, including the provision dealing with Joseph Kosow's will, was *bona fide*, resulted from arm's length bargaining by separate counsel for Joseph and Barbara, and was not an attempted subterfuge to avoid the payment of taxes. The only factual dispute raised at trial and on this appeal then is whether the agreement was supported by "adequate and full consideration in money or money's worth."

### B. *Adequate and Full Consideration.*

The IRS argued before the Tax Court that Revenue Ruling 71–67 provided the standard by which to determine whether the agreement underpinning the subsequent claims made against the estate was based on adequate and full consideration. The IRS, however, now asserts that, in determining that the payments were not deductible, the Tax Court did not apply the dollar-for-dollar standard articulated in that ruling, but instead merely found that there was insufficient evidence to support a finding that Barbara Kosow gave *any* consideration—much less full and adequate consideration—for Joseph Kosow's promise to leave two-thirds of his estate to his children.

The Estate counters by pointing to the substantial circumstantial evidence regarding the high standard of living enjoyed by Joseph and Barbara in 1951, which standard Barbara could not have maintained on the support payments Joseph agreed to make under the agreement. The Estate argues further that the recollections of those close to the situation, as well as the circumstantial evidence, establishes that Joseph was financially capable of paying more support at the time. In effect, then, the Estate argues that although one may not be able to quantify precisely the amount of support payments or assets that Barbara gave up in return for Joseph's promise to provide for the children in his will, the evidence convincingly establishes that she gave something of value in return for something of value.

---

**8.** In relevant part, 26 U.S.C. § 2053 provides:
  (a) General rule.—For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts—
    \* \* \* \* \* \*
    (3) for claims against the estate, ...
    \* \* \* \* \* \*
  as are allowable by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered.
    \* \* \* \* \* \*
  (c) Limitations—

  (1) Limitations applicable to subsections (a) and (b).—
    (A) Consideration for claims.—The deduction allowed by this section in the case of claims against the estate ... shall, when founded on a promise or agreement, be limited to the extent that they were contracted bona fide and for an adequate and full consideration in money or money's worth.

■ As is the case with any deduction, the taxpayer bears the burden of proving its entitlement for the deduction and of demonstrating that all the statutory conditions to the deduction have been met. *See Deputy v. DuPont,* 308 U.S. 488, 493, 60 S.Ct. 363, 366, 84 L.Ed. 416 (1940); *White v. United States,* 305 U.S. 281, 292, 59 S.Ct. 179, 184, 83 L.Ed. 172 (1938); *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348 (1934). The determination of whether a deduction should be allowed for a claim against an estate is fact intensive and the Court must make such determinations on a case-by-case basis. *In re Estate of Hartshorne,* 402 F.2d 592, 594 n. 2 (2d Cir.1968).

■ In this case, it is undisputed that the Estate has established every element necessary for it to demonstrate that the settlement payments constituted a deduction as a "claim against the estate," except for the requirement that all such claims must have arisen from an exchange in which the decedent received adequate and full consideration in the transaction giving rise to the claim. For an estate to receive such a deduction, the record must establish that the promise resulting in the claim on the estate "was contracted for in good faith for value which augmented the decedent's estate." *Leopold v. United States,* 510 F.2d 617, 624 (9th Cir.1975). Further, "[i]f the claim is not simply a subterfuge for a nondeductible legacy, if the claim is supported by 'adequate and full consideration,' and if the consideration is a non-zero sum which augmented the decedent's estate, then it would seem that the deduction should be allowed," even for an agreement to make payments to the apparent natural object of one's bounty. *Estate of Hartshorne,* 402 F.2d at 594–95 n. 2.

■ In this appeal, the IRS does not dispute that the waiver of support rights may constitute full and adequate consideration under § 2053; nor could it. *See Sherman v. United States,* 334 F.Supp. 1311, 1315–16 (N.D.Ga.1971), *aff'd in pertinent part,* 462 F.2d 577, 578 (5th Cir.1972); *Estate of Iversen,* 552 F.2d 977, 985 (3rd Cir.1977); *Leopold,* 510 F.2d at 624; *In re Estate of Davis,*

440 F.2d 896, 900 (3d Cir.1971); *Estate of Carli v. Commissioner,* 84 T.C. 649, 661, 1985 WL 15335 (1985); *Estate of Glen v. Commissioner,* 45 T.C. 323, 344, 1966 WL 1216 (1966). Moreover, a decision to receive lesser support payments in return for a promise by one's spouse to provide for a child in his will can free a custodial parent from having to set aside part of her income to provide for the child in the event of her former spouse's death. *Leopold,* 510 F.2d at 624 (by accepting reduced alimony, wife compensated her husband for his promise to leave money to their daughter; in effect, she diverted to her daughter that consideration which otherwise would have flowed to herself).

The IRS does argue, however, that there is insufficient evidence to determine whether Barbara gave up *anything* in exchange for Joseph's promises in the 1951 Settlement Agreement and, accordingly, it contends that the Tax Court did not err. Upon complete review of the record, this Court concludes that the Tax Court's determination was clearly erroneous.

Under Massachusetts law in 1951, Barbara Kosow would have been entitled to a support award sufficient to sustain the standard of living that she had enjoyed prior to the separation, subject to Joseph's ability to pay. *See Sack v. Sack,* 328 Mass. 600, 603–04, 105 N.E.2d 371, 374 (1952) (issue before the court was "what would be a fair and reasonable amount suitable to maintain the wife and the children consistent with their station in life and with due regard to the financial resources of the husband."). The Estate has presented substantial evidence regarding the high standard of living that the Kosows enjoyed at the time they negotiated the 1951 Settlement Agreement. In arguing that the amount agreed to by Barbara was clearly below that which would have been necessary to sustain the affluent lifestyle the couple maintained during marriage, the Estate relies, in part, on the support amount awarded in the *Sack* case.

The opinion in *Sack* suggests that the two couples shared similarly affluent lives.[9] Like

9. That the Sacks and the Kosows travelled in    similar circles is somewhat bolstered by the fact

the Kosows, the Sacks lived in a large, well furnished home in an affluent Boston suburb and employed two domestic employees to assist with household chores.[10]  Likewise, in the Sack household, the husband was the sole provider and the wife had use of her own car. In both families, the children went to summer camp; moreover, both Kosow children and one Sack child attended private school.[11]

Based on the evidence of the Sacks' standard of living, the Supreme Judicial Court of Massachusetts awarded Mrs. Sack $1,000 per month in support and an additional $500 per month in support for the Sack's two young children, for a total of $1500 in monthly support, or $18,000 per year.  Moreover, in the *Sack* case, the trial court found that the expenses incurred to maintain the Sack's home, excluding "clothing of the wife and children, children's allowance, home entertainment, house repairs, water, insurance, vacations, doctors, dentists, and charitable and church contributions," totaled $12,114.  The expenses covered by the $12,114 figure included mortgage payments, taxes, heat, automobile, maids, care of grounds, food, camps, and the boy's tuition.  *Sack,* 328 Mass. at 601, 105 N.E.2d at 372–73.

With regard to the Kosows, their agreement provided for support payments totaling $780 per month—$346.47 of which was in child support and $433.33 of which was in spousal support[12]—or $9,360 per year[13]. Accordingly, the total support to which Mrs. Kosow agreed was approximately half of that awarded to Mrs. Sack, a woman who lived in a comparable social strata prior to her divorce.  Moreover, in the *Sack* case, the trial

court found that, even excluding "clothing of the wife and children, children's allowance, home entertainment, house repairs, water, insurance, vacations, doctors, dentists, and charitable and church contributions," the annual expenses incurred to maintain the Sack's home totaled over $12,000, *Id.*

Beyond using the *Sack* case as a proxy, the Estate has also supplemented their evidence with expert testimony regarding the range of likely support awards under Massachusetts family law during the relevant time period[14]. In addition, Barbara Kosow Sack testified that she had to seek supplemental support from her father because she was unable to maintain the household on the support payments alone.  Accordingly, looking to the *Sack* case to supply a proxy for the minimum amount of support that would have been necessary to support Barbara in the manner in which she had lived pre-separation, and considering the other evidence, the Estate has demonstrated that Barbara Kosow agreed to an amount of money that was substantially less than the amount that would have been required to maintain her in her previous style.

To receive a greater award than that to which she agreed, however, Barbara Kosow would also have been required by Massachusetts law to demonstrate that Joseph was financially able to pay such an award.  It is on this second prong of the test for support that the IRS most vigorously argues the Estate to have failed in its proof.  Indeed, the evidence regarding Joseph's ability to pay any particular monthly amount—wheth-

---

that Barbara Kosow married Benjamin Sack shortly after her divorce from Joseph Kosow.

**10.**  The compensation for the Kosow's two household employees was $31 per week, whereas in *Sack,* the combined salaries of the two domestic employees was $35 per week.

**11.**  In the Sack family, only one of the children attended private school, whereas both Marvin and Jeffrey Kosow attended private school.  In the 1952 amendment to the 1951 Settlement Agreement, Joseph agreed to pay up to a total of $1,100 per year for the boys' tuition until 1955, in addition to the other support payments.

**12.**  These figures are arrived at by multiplying the weekly support award—$100 per week in spousal support and $80 per week in child support—

by 52, which represents the number of weeks in a year, and then dividing that product by 12, to arrive at a monthly support figure.

**13.**  As noted for the first three years—1952–1955—Joseph Kosow also agreed to pay the boys' tuition to private school, which combined tuition was $1,100 per year.

**14.**  This testimony placed the likely award at approximately $20,000 per year, in contrast to the $9,360 to which Barbara Kosow agreed.  Although this testimony is based on admittedly incomplete factual information, it is corroborated, at least in part, by the $18,000 per year award in the *Sack* case.

er it be $780, $1500, or more—is admittedly sparser than that presented in *Sack.* This deficiency is hardly surprising given the fact that the *Sack* support award was fully litigated and that the financial information pertinent to that decision was recent. In this case, the Kosows did not litigate their support agreement and the financial events pertinent to evaluating that agreement are more than 40 years old. Indeed, given the fact, as stipulated by the IRS, that the agreement was not a subterfuge to avoid estate tax obligations, but instead resulted from a *bona fide,* arms length negotiation to resolve a non-commercial dispute, it is not surprising that the Kosows failed to create a paper record sufficient to calculate the precise value of each of their promises.

The IRS has not argued, however, that a precise dollar-for-dollar calculation is required. Accordingly, the question remains whether the Estate has proven it more likely than not that Joseph Kosow could have afforded a significantly greater support award than that to which he agreed. This Court concludes that it did. Prior to the separation, Joseph Kosow, had been able to support his family at a level similar to that enjoyed by the Sack family, which level of expense triggered an award of approximately $720 per month more for Mrs. Sack than the amount to which Barbara Kosow agreed. At the same time that he was supporting his family in Brookline, Massachusetts in a luxurious manner, Joseph Kosow maintained an apartment in New York City. Further, there is nothing in the record to suggest that Joseph was living on credit or beyond his means.

With regard to any possible change in Joseph's financial circumstances at the time of the separation agreement, Barbara Kosow Sack did testify that, in attempting to negotiate as low a payment schedule as possible, Joseph Kosow made a general plea of poverty. Beyond this generalized plea, which plea is not altogether atypical in divorce negotiations, there is no suggestion in the record that Joseph Kosow had suffered any financial reverses that would have made it difficult for him to afford a support award comparable to that made against his counterpart, Benjamin Sack. Indeed, Joseph continued to provide support for the maintenance of the Brookline house and the separate apartment in Cambridge for himself from late 1950 until the time the settlement agreement was signed. Moreover, after signing the agreement, Joseph took on an additional obligation in 1952 to pay the boys' private school tuition for three years, which amounted to approximately $1,100 per year. Further, albeit without providing precise figures, Joseph's accountant corroborated the perception of Joseph Kosow as a person of substantial means. In short, there appears to be no dispute that Joseph Kosow was a clever businessman with a string of entrepreneurial successes in his background. Indeed, after the divorce in 1952, Joseph went on to amass an estate in excess of $26 million before his death. Taken together, these facts are highly inconsistent with the IRS's argument that Joseph would have been unable to pay more than $780 per month at the time of the divorce in 1952.

Moreover, the IRS's contention that Joseph Kosow could not have afforded greater support payments than those to which he agreed is, itself, an argument fraught with some inconsistency. Specifically, the IRS's ultimate argument is that Barbara's promise in the 1951 agreement constituted less consideration, or value, than did Joseph's reciprocal promise; that is, that Joseph Kosow's promise to leave to his sons a portion of whatever estate was in existence at the time of his death in the future was a promise of substantially greater value than Barbara's promise to forgo immediately support payments almost double those to which she agreed. The IRS sets a low value on Barbara's promise because they argue that, due to Joseph's financial situation,[15] Barbara could not have obtained a greater award had she litigated the divorce. Yet, in making that argument, the IRS is necessarily arguing that Joseph's financial status had declined from that in existence during the time of his marriage. If Joseph Kosow's financial

---

15. More precisely, the IRS argues that the Estate has not offered proof about Joseph Kosow's financial position sufficient to permit an inference about his ability to pay a greater award.

prospects were in a downward spiral, however, then logically his promise to leave money to the children in the future was also a promise of greatly diminished value. If, on the other hand, Joseph's promise to leave a portion of his estate to his children was a promise of significant value, then Joseph must have had financial means sufficient to imply that his estate would not be insubstantial. In short, if Joseph's promise was not worth much, then Barbara's promise was likely also of diminished value; if Joseph's promise had a substantial value, then likewise so did Barbara's. In either event, on the facts of this case, the reciprocal consideration appears substantially equal.

Further, in addition to forgoing support payments of a level commensurate with her former style of life, Barbara also waived all rights to go back into court and modify her support award due to changed circumstances. Given the young ages of the Kosows at the time of their divorce, the young ages of their two children, the fact that Barbara Kosow appears not to have worked outside the home during the marriage, and Joseph's proven ability as a businessman, such a waiver of the right to seek an increased support award in the future would, by itself, suggest some valuable consideration. See *Estate of Iversen*, 552 F.2d at 984 (wife's relinquishment of ability to go back into court for upward support adjustments constituted a valuable "promise" to husband).

■ Finally, allowance of the requested deduction in this case does not undermine the underlying policy behind § 2053, which is to allow an estate to deduct from its gross income legitimate claims that it is required to pay and would not likely be inclined to pay, absent a binding agreement, but to disallow claims based on agreements that are nothing more than disguised bequests. In this case, it is clear that the Estate's payment of monies to Jeffrey and Marvin Kosow was triggered solely by the existence of a binding agreement and not by any donative intent on the part of the Estate. Indeed, Jeffrey and Marvin Kosow had to sue the estate before it would pay them anything. Moreover, the Estate has demonstrated that the agreement on which the Kosow sons based their claim was not a disguised bequest, but instead was a promise based on arm's length negotiation and the exchange of full and adequate consideration.

## V. CONCLUSION

In summary, on the specific facts of this case, we conclude that the Tax Court erred in its conclusion that the agreement from which the claim arose was not an agreement supported by full and adequate consideration. Because the agreement was supported by full and adequate consideration. Because the agreement was supported by full and adequate consideration, the Estate of Joseph P. Kosow is entitled to a deduction pursuant to 26 U.S.C. § 2053 of the Internal Revenue Code.

We VACATE the Tax Court's decision and REMAND this case with instructions that the Estate of Joseph P. Kosow be allowed a deduction of $4 million from its taxable estate for payments made in satisfaction of claims against the Estate by Marvin and Jeffrey Kosow.

VACATED and REMANDED.