[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-14049

_____

ESTATE OF RICHARD D. SPIZZIRRI, DECEASED,
John H. McAtee, Jr., Personal Representative,

Petitioner-Appellant,

*versus*

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

_____

Petition for Review of a Decision of the
U.S. Tax Court
Agency No. 19124-19

_____

Before WILLIAM PRYOR, Chief Judge, and GRANT and LUCK, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether an estate was entitled, for tax purposes, to deduct a $3 million transfer to the decedent's stepchildren as a "claim[] against the estate." 26 U.S.C. § 2053(a)(3). Richard Spizzirri and his fourth wife, Holly Lueders, entered into a prenuptial agreement that required his estate to transfer $6 million to Lueders and $3 million to her children from a previous marriage upon his death. The agreement stated that those payments were "in lieu of any other rights which may be available to [Lueders]" as Spizzirri's "surviving spouse." After Spizzirri's death, the estate paid the stepchildren and deducted the payments as "claims against the estate." *Id.* When the Commissioner of Internal Revenue sent a notice of deficiency denying those deductions, the estate petitioned the tax court for review. The tax court ruled after a trial that the transfers to the stepchildren were not deductible as "claims against the estate" because they were neither "contracted bona fide" nor "for an adequate and full consideration in money or money's worth." *Id.* § 2053(a)(3), (c)(1)(A). We affirm.

## I. BACKGROUND

On March 4, 1997, 64-year-old Richard Spizzirri entered into a prenuptial agreement with his soon-to-be fourth wife, 48-year-old Holly Lueders. Spizzirri then had a net worth between $24.7 million and $27.7 million, an annual income of $720,000, and four

children from his first marriage. Lueders had a net worth of over $1 million, no income, and three children.

The agreement initially recited the parties' intentions. One recital, for example, stated that Lueders "agreed to accept the provisions set forth in this Agreement in place of all rights in the property and estate of [Spizzirri], either as his wife during her lifetime, or as his widow, heir-at-law, next-of-kin, or distributee upon his death." The rest of the agreement defined the parties' rights and waivers of rights on distinct subjects.

Article IV of the agreement addressed Lueders's estate rights if they remained married and cohabitated until Spizzirri's death. Lueders waived any right as a "surviving spouse to all or any part of the estate or property of [Spizzirri] . . . , including any income interest, dower, curtesy, . . . or other marital interest of any kind whatsoever." "[I]n lieu of any other rights which may [have] be[en] available to [Lueders] as the surviving spouse of [Spizzirri]," Lueders accepted: (1) 25 percent of Spizzirri's gross estate in a marital trust; (2) the right to live in his Easthampton home or any other primary residence for five years without payment; and (3) 12.5 percent of the sale proceeds of his Aspen home. Article IV also provided that "nothing . . . shall be deemed to constitute a waiver by either [Spizzirri] or [Lueders] of the right to accept or disclaim, in whole or in part, any bequest, dower or gift made . . . in the Last Will and Testament of the other or during their lifetimes."

Articles V and VI addressed Spizzirri and Lueders's spousal support and property rights in the event of the dissolution of their

marriage. In Article V, both agreed to waive all rights to the other's separate property. Spizzirri agreed to provide Lueders up to $5.5 million, minus the value of her 12.5 percent interest in gross sale proceeds of his Aspen home. Spizzirri's concessions were "in consideration of [Lueders's] relinquishment of any rights she has or might have at such time to maintenance or support and any claims she has or might have to equitable distribution." In Article VI, Spizzirri and Lueders agreed to waive "any and all right to seek maintenance . . . , spousal support, or alimony" except as provided in the agreement.

During their 18-year marriage, Spizzirri and Lueders modified the agreement five times. On November 3, 2005, the parties entered into their third modification and amended Article IV to "provide for [Lueders] following the death of [Spizzirri]." Lueders waived her right to a trust funded with 25 percent of Spizzirri's gross estate upon his death. And she forfeited her right to reside, free of rent or charge, in any primary residence. In exchange, Spizzirri agreed to "make, and keep in effect, a will" providing that upon his death, Lueders would receive: (1) a $9 million cash payment, including $6 million to Lueders and $3 million to her adult children; (2) a transfer of his right, title, and interest in his New York City penthouse apartment; and (3) a five-year right to reside in the Easthampton home without charge. The third modification stated that Lueders would "accept the . . . provisions in lieu of any other rights which may be available to her as [Spizzirri's] surviving spouse." Two months later, Spizzirri and Lueders modified the agreement to remove the requirement that they reside together for

their mutual promises to come due. And, in each of the final two modifications, Spizzirri reaffirmed his promise to pay $1 million to each of his three stepchildren.

Spizzirri and Lueders became estranged. Spizzirri fathered two children with two women outside of his marriage. He also made large payments to multiple women and family members. He paid Hadria Lawner, with whom he had purchased a Miami condominium, $90,214 total from 2013 through 2015. And he made payments to one of Lueders's daughters, Venetia Young, totaling $25,700 in 2014 and $21,000 in 2015. Spizzirri made the last of these payments the month before his death.

Although the agreement required Spizzirri to maintain a will that reflected the parties' agreements in Article IV, he failed to do so. In 1979, Spizzirri had executed a will that left his estate largely to the four children from his first marriage.

Beginning in 2014, Spizzirri executed four codicils to his will. The first three codicils specified the inheritance rights of Spizzirri's sons who were born outside of his marriage. The last codicil provided that his estate would satisfy the mortgage of the condominium he owned with Lawner and transfer his interest to her. Spizzirri did not amend his will to include the terms provided in the agreement or its modifications.

After Spizzirri's death in May 2015, his stepchildren filed claims in the Pitkin County District Court seeking payment under the third modification of the prenuptial agreement. In 2016, the estate paid the three stepchildren $1 million each and penalties for

late payment. The estate filed a Form 1099-MISC and deducted the payments to the stepchildren as claims against the estate. The Commissioner of Internal Revenue issued a notice of deficiency that disallowed the deductions for the payments to the stepchildren.

The estate petitioned the tax court for review. At trial, the estate presented seven witnesses. Some witnesses opined on the enforceability of the agreement between Spizzirri and Lueders and the value of the marital rights that Lueders waived in the agreement. Others testified about Spizzirri's personal life leading up to his death. For example, one witness testified that Spizzirri agreed to make payments "to keep [Lueders] happy" and "show[] largesse to her children." That witness explained that Spizzirri "wanted to keep his fourth marriage [a]s his last marriage" and "avoid[] the expense . . . [o]f a potential divorce," so he "was doing what he could to keep [Lueders] intact and married to him." The estate did not call any of Spizzirri's stepchildren as witnesses, nor did it introduce any evidence that they had reported the payments as taxable income. The Commissioner did not present any witnesses at trial.

The tax court ruled that the estate did not produce the "credible evidence" necessary to shift the burden of proving entitlement to a deduction. 26 U.S.C § 7491(a). It also ruled that the payments to Spizzirri's stepchildren were not deductible as "claims against the estate" because they were neither "contracted bona fide" nor "for an adequate and full consideration in money or money's worth." *Id.* § 2053(a)(3), (c)(1)(A). The tax court also addressed

other adjustments to the estate's liability that the estate had challenged.

## II. STANDARDS OF REVIEW

We review the tax court's conclusions of law *de novo* and its findings of fact for clear error. *Hewitt v. Comm'r*, 21 F.4th 1336, 1341–42 (11th Cir. 2021). "The determination of whether a deduction should be allowed for a claim against an estate is fact intensive and the Court must make such determinations on a case-by-case basis." *Est. of Kosow v. Comm'r*, 45 F.3d 1524, 1531 (11th Cir. 1995).

## III. DISCUSSION

The Internal Revenue Code taxes "the transmission of wealth at death" through an estate tax. *United States v. Stapf*, 375 U.S. 118, 134 (1963); 26 U.S.C. § 2001. The taxpayer determines the taxable estate by subtracting any allowable deductions from the value of the decedent's gross estate. 26 U.S.C. §§ 2051, 2053(a). A taxpayer hoping to exercise his "legal right . . . to decrease the amount of what otherwise would be his taxes . . . by means which the law permits," *Gregory v. Helvering*, 293 U.S. 465, 469 (1935), reduces his gross estate by increasing his deductions.

An estate may deduct "claims against the estate" allowable under state law, 26 U.S.C. § 2053(c)(1)(A), but section 2053 ensures that gifts and testamentary transfers are "not transformed into deductible claims through collaboration and creative contracting," *Est. of Huntington v. Comm'r*, 16 F.3d 462, 465 (1st Cir. 1994); *see also Stapf*, 375 U.S. at 131 ("Absent such an offset or augmentation of

the estate, a testator could disguise transfers as payments in settlement of debts and claims and thus obtain deductions for transmitting gifts."). To qualify as a deductible "claim[] against the estate," a claim must be "contracted bona fide *and* for an adequate and full consideration in money or money's worth." 26 U.S.C. § 2053(c)(1)(A) (emphasis added).

Spizzirri's estate deducted the payments to the stepchildren as "claims against the estate," and the Commissioner denied that deduction on the ground that the payments were neither "contracted bona fide" nor "for an adequate and full consideration." Because we agree with the Commissioner that the payments were not contracted bona fide, we do not reach the issue of consideration.

As a preliminary matter, the estate argues that it shifted its burden of proving entitlement to the deduction to the Commissioner. The taxpayer bears the initial burden of proving entitlement to a deduction. *See Kosow*, 45 F.3d at 1531 (requiring the taxpayer to prove that the "statutory conditions to the [claimed] deduction" were met). The taxpayer may shift the burden of proof to the Commissioner if the taxpayer introduces "credible evidence" that he is entitled to a deduction. 26 U.S.C. § 7491(a). To shift the burden, the taxpayer must also comply with the requirements to "substantiate any item" and "maintain[] all records required." *Id.* § 7491(a)(2)(A)–(B).

We agree with the Commissioner that the estate failed to introduce the "credible evidence" necessary to shift the burden. *Id.* § 7491(a). The estate's expert testified that Spizzirri agreed to make

payments "to keep [Lueders] happy" and "show[] largesse to her children" and "was doing what he could to keep [Lueders] intact and married to him." The estate also failed to call the stepchildren as witnesses though it could have asked them whether they reported the payments as income.

The "bona fide" requirement in section 2053(c)(1)(A) bars a deduction for a claim "to the extent it is founded on a transfer that is essentially donative in character (a mere cloak for a gift or bequest)." Treas. Reg. § 20.2053-1(b)(2)(i) (2009). In transactions between family members, "a testator is mo[re] likely to be making a bequest . . . than repaying a real contractual obligation." *Huntington*, 16 F.3d at 466. So we "subject [those transactions] to particular scrutiny, even when they apparently are supported by monetary consideration." *Id.* Because Spizzirri's stepchildren were "lineal descendants of . . . [his] spouse," we apply the same "particular scrutiny" to the estate's payments to the stepchildren that we do to transactions between family members. *See* Treas. Reg. § 20.2053-1(b)(2)(iii)(A) (defining "[f]amily members" as including the "spouse of the decedent" and "lineal descendants" of "the decedent's spouse").

To guide our evaluation of intrafamily transfers, the Treasury Regulations list five factors that suggest a transfer was contracted bona fide. *Id.* § 20.2053-1(b)(2)(ii). First, "[t]he transaction underlying the claim . . . occurs in the ordinary course of business, is negotiated at arm's length, and is free from donative intent." *Id.* § 20.2053-1(b)(2)(ii)(A). Second, the claim "is not related to an

expectation or claim of inheritance." *Id*. § 20.2053-1(b)(2)(ii)(B). Third, the claim "originates pursuant to an agreement between the decedent and the family member." *Id*. § 20.2053-1(b)(2)(ii)(C). Fourth, "[p]erformance by the claimant" stems from "an agreement between the decedent and the family member." *Id*. § 20.2053-1(b)(2)(ii)(D). Fifth, "[a]ll amounts paid in satisfaction or settlement of a claim or expense are reported by each party for Federal income and employment tax purposes . . . in a manner that is consistent with the reported nature of the claim or expense." *Id*. § 20.2053-1(b)(2)(ii)(E).

Each factor weighs against finding that the payments to Spizzirri's stepchildren were contracted bona fide. First, the transaction underlying the stepchildren's claim—the third modification—did not "occur[] in the ordinary course of business" and was not "free from donative intent." *Id*. § 20.2053-1(b)(2)(ii)(A). At the third modification, Lueders and Spizzirri were legally married. As the estate's witness explained, Spizzirri agreed to make the payments to his stepchildren in the third modification to keep his wife happy and "show[] largesse to her children." Because Spizzirri "wanted to keep his fourth marriage [a]s his last" and "avoid[] the expense . . . [o]f a potential divorce," the witness testified that Spizzirri "was doing what he could to keep [Lueders] intact and married to him." This circumstance is not the sort of "arm's length" transaction in the "ordinary course of business" that qualifies as a "claim[] against the estate." *Id*.; 26 U.S.C. § 2053(a). That Spizzirri and Lueders eventually became estranged does not inform our inquiry because we evaluate donative intent *at the time of the agreement*. *See Est. of*

*Herrmann v. Comm'r*, 85 F.3d 1032, 1039 (2d Cir. 1996) (focusing the section 2053(c)(1)(A) inquiry on the time that the parties entered into their prenuptial agreement). But even if we consider Spizzirri's donative intent leading up to his death, his gifts to Lueders's daughter totaled $21,000 in 2015 and continued until the month before his death. That Spizzirri regularly gave money to some of these same stepchildren before his death reflects his donative intent.

The estate erroneously relies on our decision in *Estate of Kosow v. Commissioner* to argue that the stepchildren's filing of claims to recover the payments belies a finding of donative intent. 45 F.3d at 1534. Mr. Kosow agreed to finance his sons' college educations and leave them two-thirds of his estate in exchange for his spouse's acceptance of reduced support payments and waiver of other rights. *Id.* at 1527. The Kosows made this agreement in anticipation of their imminent divorce, so the Commissioner *stipulated* that it was contracted bona fide. *Id.* We also stated that Mr. Kosow's estate "demonstrated that the agreement on which the Kosow sons based their claim was not a disguised bequest" because the children "had to sue the estate before it would pay them anything." *Id.* at 1534. But *Kosow* did not decide the bona-fide issue, so the estate's reliance on this dictum is misplaced. *See Finn v. Cobb Cnty. Bd. of Elections & Registration*, 111 F.4th 1312, 1317 (11th Cir. 2024) ("[T]he holding of a case comprises both the result of the case and those portions of the opinion necessary to that result. Any other statements that are not necessary to the result are dicta and do not bind us." (internal citations and quotation marks omitted)). Moreover, we consider the decedent's donative intent at the time of the

agreement, not the estate's intent when payment becomes due. *See* Treas. Reg. § 20.2053-1(b)(2)(ii)(A); *Herrmann*, 85 F.3d at 1039.

Second, the payments to Spizzirri's stepchildren were related to Lueders's expectation or claim of inheritance. Although the stepchildren may not have expected to inherit from Spizzirri, they need not have a personal expectation or claim to inheritance for the bequest to be "related to an expectation or claim of inheritance." Treas. Reg. § 20.2053-1(b)(2)(ii)(B). Lueders negotiated the stepchildren's payments in lieu of her expectation or claim to inheritance. The third modification states that the provisions in Article IV were "in lieu of any other rights which may be available to [Lueders] as [Spizzirri's] surviving spouse." And that Article required Spizzirri to "make, and keep in effect, a will" embodying their agreement. Because the payments to the stepchildren were contracted "in lieu" of Lueders's rights as a surviving spouse, the stepchildren's claims were "related to" Lueders's "expectation or claim of inheritance." *Id.*

The payments to the stepchildren also lacked the other characteristics of a bona-fide transaction. The claims, for example, did not originate from any transaction between the stepchildren and Spizzirri. *See id.* § 20.2053-1(b)(2)(ii)(C). Nor were the stepchildren obligated to perform under any agreement. *Id.* § 20.2053-1(b)(2)(ii)(D). The estate also failed to introduce any evidence that the stepchildren reported the estate's payments as income. *Id.* § 20.2053-1(b)(2)(ii)(E).

## IV. CONCLUSION

We **AFFIRM** the judgment in favor of the Commissioner.