USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-1602 ESTATE OF ELIZABETH G. HUNTINGTON, DECEASED, NANCY H. BRUNSON, ADMINISTRATRIX, Petitioner, Appellant, v. COMMISSIONER OF INTERNAL REVENUE, Respondent, Appellee. ____________________ APPEAL FROM THE UNITED STATES TAX COURT [Hon. Stephen J. Swift, U.S. Tax Judge] ______________ ____________________ Before Selya, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ ____________________ Michael E. Chubrich for appellant. ___________________ Annette M. Wietecha, with whom Gary R. Allen, Ann B. Durney, and ____________________ ______________ _____________ Michael L. Paup, Acting Assistant Attorney General, were on brief ________________ for appellee. ____________________ February 23, 1994 ____________________ COFFIN, Senior Circuit Judge. Charles and Myles Huntington ____________________ claim that their stepmother, the decedent, promised as part of a reciprocal will agreement with their father that she would devise her estate in equal shares to them and their stepsister. Decedent died intestate, leaving the sons without an inheritance. Their claim against her estate ultimately led to a $425,000 settlement. The question posed by this appeal is whether the estate may deduct the settlement amount for purposes of the federal estate tax. The answer depends upon whether the mutual will agreement was "contracted bona fide and for an adequate and full consideration in money or money's worth," as required by 26 U.S.C. 2053(c)(1)(A).1 After careful review of the facts and precedent, we affirm the Tax Court's determination that the claim is not deductible. ____________________ 1 Section 2053 provides in relevant part: (a) General rule.--For purposes of the tax imposed ____________ by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts-- * * * (3) for claims against the estate, . . . as are allowable by the laws of the jurisdiction . . . under which the estate is being administered. * * * (c) Limitations.-- ___________ (1) Limitations applicable to subsections (a) _________________________________________ and (b).-- _______ (A) Consideration for claims.--The deduction ___________________________ allowed by this section in the case of claims against the estate . . . shall, when founded on a promise or agreement, be limited to the extent that they were contracted bona fide and for an adequate and full consideration in money or money's worth . . . . -2- -3- I. Factual Background __________________ The decedent, Elizabeth Huntington, married Dana Huntington on October 15, 1955. At that time, Dana's two sons from his previous marriage, Charles and Myles, were, respectively, 30 and 28 years old. Elizabeth and Dana had one daughter, Nancy. On January 3, 1978, Dana executed a will in which he devised to Nancy, Charles and Myles $25,000 each. The remainder of his estate would be held in trust for the benefit of Elizabeth, and, upon her death, the trust would terminate and the corpus would be distributed in equal shares to the three children. This will was revoked by Dana on May 8, 1979, when, during the illness that led to his death, he executed a new will. The later will stated that Dana intentionally was making no provision for Charles, Myles and Nancy. Instead, Dana devised his entire estate to Elizabeth. Dana died on April 6, 1980, and his May 8, 1979, will was admitted to probate. Charles and Myles maintain that their father changed his will in 1979 to give everything to Elizabeth only because she agreed to execute a will devising her estate in three equal shares to Nancy, Charles and Myles. They point to Dana's previous will to demonstrate his intent to make direct bequests to his sons, and they refer to conversations through the years in which Dana acknowledged a moral obligation to leave part of his estate to his sons in order to compensate for the inadequate divorce settlement their mother received. -4- They also offer direct evidence of an agreement between the couple. Dana's attorney, William Beckett, testified in his deposition that, shortly before execution of the 1979 will, Dana and Elizabeth discussed the arrangement in which Dana would leave everything to her and she shortly would draft a will that would include Charles and Myles. Also in a deposition, Myles's wife testified that at the family luncheon immediately following Dana's funeral, Elizabeth told her that "`Dana left everything to me,' meaning herself, with the understanding that upon her death, everything would be divided equally between the boys . . . and Nancy . . . ." See App. at 133. ___ Charles and Myles initially attempted to challenge the May 8, 1979 will based on their father's alleged mental incompetence. They dropped that lawsuit,2 and on September 10, 1981, filed a petition in Rockingham County (N.H.) Superior Court seeking to impose a constructive trust on all of the property received by Elizabeth from Dana's estate and on all of the property owned by the decedent on and after May 8, 1979, the date of Dana's final will. They alleged that Dana and decedent had made a binding oral agreement to execute reciprocal wills, and that Elizabeth had not yet executed a will in compliance with the agreement. On November 12, 1981, the superior court issued a temporary restraining order barring Elizabeth from taking any actions to encumber or transfer the property. Five years later, on December ____________________ 2 They abandoned this effort because of the difficulty of proving that the will was the product of undue influence, see ___ Deposition of Myles Huntington, May 16, 1986, at 27. -5- 10, 1986, Elizabeth, Charles and Myles settled the constructive trust lawsuit. The settlement provided that Elizabeth would execute a will in which she would devise 20 percent of her estate to each of Dana's sons. Two weeks later, however, on December 24, 1986, Elizabeth died intestate. Charles and Myles filed a notice of claim against her estate and, subsequently, they filed a lawsuit to enforce the settlement terms. Charles, Myles, and their stepsister, Nancy -- as administratrix of her mother's estate -- eventually settled the lawsuit brought to enforce the terms of the earlier constructive trust settlement. Under the second settlement, Nancy agreed to pay to Charles and Myles a total of $425,000, an amount representing 40 percent of Elizabeth's estate. Nancy made that payment on April 14, 1989. On the federal tax return for Elizabeth's estate, a deduction was taken for the settlement payment based on section 2053(a)(3) of the Internal Revenue Code, which allows deductions for "claims against the estate."3 The Commissioner disallowed the deduction, and calculated a deficiency of $117,067 in the estate tax.4 ____________________ 3 The estate return was filed before the settlement reached among Charles, Myles and Nancy and the amount originally deducted was $350,000. The estate later claimed a deduction for the full amount of the $425,000 payment. 4 Both the Tax Court opinion and the Commissioner's brief on appeal state that the Commissioner rejected the deduction on the ground that the payment was a testamentary disposition rather than a claim against the estate within the meaning of section 2053(a). The Commissioner's Notice of Deficiency did not specify the basis of the rejection. See App. at 73. ___ -6- The Tax Court affirmed. It found that the asserted reciprocal will agreement between Dana and Elizabeth lacked adequate consideration to support a "claim[] against the estate" within the meaning of section 2053. The court concluded that the only consideration underlying the agreement was the couple's "donative intent," making the agreement a testamentary arrangement rather than an arms-length deal providing the basis for a deduction. The court further held that the lawsuit filed by Charles and Myles to enforce the alleged reciprocal will agreement did not change the essence of the sons' claim so as to render their claim deductible. On appeal, the estate argues that Elizabeth received substantial consideration in exchange for her promise to provide for Charles and Myles in her will -- the excess amount over what she would have received under Dana's revoked 1978 will -- and that this consideration made the sons' claim fully enforceable and deductible. In addition, the estate contends that Elizabeth also received valuable consideration when she agreed in December 1986 to settle the constructive trust lawsuit. In exchange for her promise to execute a will in which she would devise 40 percent of her estate to Charles and Myles, her stepsons released their claim to two-thirds of her estate. The estate contends that either or both of these considerations is sufficient to support its claim to a deduction under section 2053. As there is no material dispute concerning the underlying facts, our task is to determine solely whether the Tax Court -7- properly applied the statute in these circumstances. Our review therefore is de novo. See LeBlanc v. B.G.T. Corp., 992 F.2d 394, __ ____ ___ _______ ____________ 396 (1st Cir. 1993). II. At the risk of stating the obvious, we think it worth noting at the outset that any analysis of estate tax issues must be sensitive to "the general polic[y] of taxing the transmission of wealth at death," United States v. Stapf, 375 U.S. 118, 134 _____________ _____ (1963). Section 2053 of the Internal Revenue Code, which allows deductions from a decedent's gross estate for certain claims, has been carefully crafted to promote that policy. In a series of revisions to the statutory language early in the century, increasingly formal requirements were imposed on claims based on promises or agreements, see Taft v. Commissioner, 304 U.S. 351, ___ ____ ____________ 355-56 (1938);5 Estate of Pollard, 52 T.C. 741, 744 (1969), "to __________________ ____________________ 5 The history of section 2053 was detailed in Taft as ____ follows: The Revenue Act of 1916 permitted the deduction of the amount of claims against the estate "allowed by the laws of the jurisdiction . . . under which the estate is being administered." . . . The Act of 1924 altered existing law and authorized the deduction of claims against an estate only to the extent that they were "incurred or contracted bona fide and for a fair consideration in money or money's worth." Congress had reason to think that the phrase "fair consideration" would be held to comprehend an instance of a promise which was honest, reasonable, and free from suspicion whether or not the consideration for it was, strictly speaking, adequate. The words "adequate and full consideration" were substituted by 303(a)(1) of the Act of 1926. 304 U.S. at 356 (footnotes omitted). -8- prevent deductions, under the guise of claims, of what were in reality gifts or testamentary dispositions," Carney v. Benz, 90 ______ ____ F.2d 747, 749 (1st Cir. 1937). In other words, Congress wanted to be sure that bequests to family members and other natural objects of the decedent's bounty were not transformed into deductible claims through collaboration and creative contracting. See Bank of New York v. United States, ___ ________________ _____________ 526 F.2d 1012, 1016-17 (3d Cir. 1975); Carney, 90 F.2d at 749; ______ Estate of Satz v. Commissioner, 78 T.C. 1172, 1178 (1982); _______________ ____________ Pollard, 52 T.C. at 744. Thus, a "claim against the estate" is _______ deductible only if the agreement giving rise to the claim was "contracted bona fide and for an adequate and full consideration in money or money's worth," 26 U.S.C. 2053(c)(1)(A). Thus far, this case has focused primarily on whether Elizabeth Huntington received sufficient consideration, within the meaning of section 2053, for her promise to include Charles and Myles in her will. The Tax Court concluded that the Huntingtons' reciprocal will agreement was supported only by donative intent, and that this was not enough to establish a deductible claim. In its notice of appeal and in its brief, the estate specifically challenges the Tax Court's failure to credit as consideration Elizabeth's enhanced inheritance -- the immediate $75,000 representing the bequests previously earmarked for Charles, Myles and Nancy, plus absolute rights in the balance of Dana's estate (in contrast to simply a life estate). Alternatively, it offers as "adequate and full" consideration the -9- financial benefit conferred on Elizabeth when Charles and Myles dropped the constructive trust lawsuit in exchange for her second promise to include them in her will. Our view of the caselaw, reflected against the backdrop of section 2053(c)(1)(A)'s limiting purpose, persuades us that the real issue here is not whether Elizabeth received a financial benefit from the reciprocal will agreement -- clearly, she did -- but whether the mutual promises made by Dana and Elizabeth created the sort of "bona fide" contractual obligation for which section 2053 allows a deduction. We have little difficulty in concluding that they did not. Two threshold propositions inform our inquiry. First, transactions among family members are subject to particular scrutiny, even when they apparently are supported by monetary consideration, because that is the context in which a testator is most likely to be making a bequest rather than repaying a real contractual obligation. See Bank of New York, 526 F.2d at 1016; ___ ________________ Estate of Morse v. Commissioner, 69 T.C. 408, 418 (1977), aff'd _______________ ____________ _____ per curiam, 625 F.2d 133 (1980); Estate of Woody, 36 T.C. 900, ___________ ________________ 903 (1961).6 Second, we need not be concerned with whether a tax avoidance motive was present here, "because it is the substance of the arrangement as a potential device for defeating the estate tax that is of controlling significance," Estate of Pollard, 52 _________________ ____________________ 6 We note, however, that a close relationship does not necessarily preclude a deduction under section 2053. See infra ___ _____ at 13-14. It simply requires close judicial review. Estate of __________ Morse, 69 T.C. at 418. _____ -10- T.C. at 745. See also Young v. United States, 559 F.2d 695, 703 ___ ____ _____ _____________ (D.C. Cir. 1977). Thus, while the record in this case provides no evidence that the Huntingtons sought to defeat estate taxes through their reciprocal will agreement, this fact does not assist the estate's effort to overturn the deficiency judgment. The record is equally barren of evidence indicating that the agreement was other than a collaborative effort to pass on the family's assets. From all that appears in the record, it is most plausible that Dana and Elizabeth discussed their respective desires for disposing of their property, and concluded that everyone's needs would be met by the simple will ultimately executed by Dana on May 8, 1979, and the will Elizabeth was expected to complete shortly thereafter. Such a purely voluntary, testamentary arrangement is not the product of a bona fide contract, and consequently does not provide a basis for a deduction under section 2053. The estate suggests that, because Dana had a firm commitment, evidenced by his prior wills,7 to make direct bequests to his sons, the change in his last will must have been the product of bona fide bargaining between the couple. Neither the fact that Elizabeth received an immediate advantage, relative to the earlier wills, nor Dana's longstanding intention to make ____________________ 7 The will in effect before 1978, which had been executed in 1971, provided for a bequest of one-half of his adjusted gross estate to Elizabeth, and for the rest to pass to Myles and Charles. -11- his sons beneficiaries of his estate is enough, however, to transform an apparently cooperative agreement into a bona fide contract. See Estate of Morse, 69 T.C. at 418. ___ _______________ Dana simply may have changed his mind about the best way to provide for his family, either before or after discussion with Elizabeth. By passing on his entire estate to his wife, who was substantially younger than himself, he could ensure that she would be fully provided for as long as she lived. He may have felt that Charles and Myles, both well into adulthood, had no immediate need for the money. By securing his wife's agreement that the balance of both of their estates would be divided equally among the couple's three children, he still could fulfill his moral obligation to Charles and Myles. There is no evidence that Dana and Elizabeth reached agreement on the asserted reciprocal wills only after a period of give-and-take bargaining. Indeed, Dana's sister testified that her brother's lawyer suggested that "he not discuss every last detail of his estate plan [with Elizabeth] because . . . she would probably want to argue over every point." Elizabeth's wishes may have played a substantial role in Dana's decision to change his will -- she was, after all, his wife -- but the record is silent as to any form of negotiations.8 ____________________ 8 In its brief, the estate points to comments allegedly made by Elizabeth and by Dana's sister, Marjorie, suggesting that Dana became increasingly vulnerable to Elizabeth's "verbal onslaughts" during his illness and that Elizabeth was aggressive on money issues after Dana's death. This evidence does not, however, reveal why and how Dana and Elizabeth decided to execute reciprocal wills. -12- This is not to say that "hard bargaining as would occur between hostile parties is [] an absolute prerequisite to a deduction under section 2053," Estate of Morse, 69 T.C. at 419. _______________ But when family members adopt a course of action whose object is to pass on their collective wealth, a deduction for the amount ultimately transferred is not permitted under section 2053 unless there is some showing of a bargained-for exchange. Any other conclusion would seriously undermine the policy of taxing the transfer of wealth at death. Where, as here, there is no evidence of any type of negotiations, the claim to deductibility unquestionably fails for lack of proof. The language of the Third Circuit in Bank of New York v. _________________ United States, 526 F.2d at 1017, is equally applicable here: _____________ When the interests of family members are not divergent but coincide so that the elements of a transaction advance the separate concerns of each, we are unable to find the arm's length bargain mandated by the Code. This Court has adhered to the distinction between family arrangements bargained for at arm's length and family arrangements that reflect a community of interests. Tax advantages are not permitted when an agreement between members of a family could be regarded as a cooperative attempt to make a testamentary disposition rather than as an arm's length bargain. Indeed, on the issue of arm's-length bargaining, the case before us is indistinguishable from Bank of New York, in which a _________________ husband and wife executed reciprocal wills leaving their estates first to each other and then to specifically identified friends and relatives. The wife later made several changes in her will, eliminating one of the husband's chosen beneficiaries and limiting the bequest to the other. The wife's estate eventually -13- settled with the two disadvantaged beneficiaries, and then sought to deduct the settlement payment for estate tax purposes. The Third Circuit upheld the Commissioner's rejection of the deduction, concluding that "the value of the claim settled by the estate may not be deducted if the agreement on which the claim was based was not bargained at arm's length." 526 F.2d at 1016. The court found that no such bargaining took place there because the parties were "of one mind" when they executed the mutual wills for the purpose of fixing the ultimate disposition of their property. Id. at 1017. "There is nothing in the record," the ___ court observed, "to support a finding that the mutual wills here were executed as the result of an arm's length bargain of any sort." Id. ___ The court in Bank of New York carefully and appropriately _________________ distinguished cases involving family arrangements in which deductions were upheld, noting that they involved "the sort of agreements that arise between parties separated by divergent interests," id. at 1016-17. The clearest cases are those arising ___ in the divorce setting, where it is likely that the estranged spouses obtain advantages only by trading them for concessions on other issues. See, e.g., Leopold v. United States, 510 F.2d 617, ___ ____ _______ _____________ 624 (9th Cir. 1975); Estate of Scholl v. Commissioner, 88 T.C. _________________ ____________ 1265, 1276 (1987).9 ____________________ 9 Even in the divorce context, however, a claim will not always be fully deductible. See In re Estate of Hartshorne, 402 ___ ___________________________ F.2d 592, 596 (2d Cir. 1968) (deduction allowed for ex-wife's life interest in property but denied for children's remainder interest). -14- In other instances, courts have upheld deductions when the underlying transactions demonstrated that the claim at issue was based on a "purely commercial undertaking," Carney, 90 F.2d at ______ 749, or was "[i]n no sense . . . a device for making a testamentary gift," Estate of Woody, 36 T.C. at 904. In Woody, a _______________ _____ deduction was allowed for a father's $14,000 bequest to his daughter that was intended as reimbursement for the daughter's earlier release of her brother -- at her father's request -- from an indebtedness in that specific amount. In Carney, the claim ______ against the decedent's estate was based on a guaranty given by the decedent on behalf of his wife and daughter in a regular business context. Some courts have suggested that a bona fide, deductible claim can be differentiated from one that fails to meet the requirements for deductibility by examining whether the claim is against the estate or to a portion of the estate. See, e.g., _______ __ ___ ____ Latty v. Commissioner, 62 F.2d 952, 953 (6th Cir. 1933); Estate _____ ____________ ______ of Lazar v. Commissioner, 58 T.C. 543, 552 (1972). In other ________ ____________ words, if the debt underlying the claim has its origin in a discretionary desire to pass on wealth to specific individuals -- giving those individuals a claim "to" a portion of the estate -- it is unlikely to be the sort of bona fide, arm's-length obligation that is deductible under the statute. Deductible claims will have arisen from transactions that created true debts "against" the estate. -15- The estate, of course, insists that there was a debt here ___ once Elizabeth made her promise and received a financial benefit, but then reneged on the deal. It may be that, under state law, the reciprocal will agreement was an enforceable contract that, when violated, created a debt in favor of Charles and Myles against the estate. A valid contract is not necessarily enough, however, to establish a deductible claim for purposes of section 2053. Bank of New York, 526 F.2d at 1015; see also Stapf, 375 _________________ ___ ____ _____ U.S. at 131; Luce v. United States, 444 F. Supp. 347, 350 (W.D. ____ _____________ Mo., S.D. 1977); Carli v. Commissioner, 84 T.C. 649, 658 (1985); _____ ____________ Pollard, 52 T.C. at 744 ("To be sure, the mutual promises _______ undoubtedly constitute consideration under the law of contracts. But the statute requires more."). A claim derived solely from Dana Huntington's desire to share some portion of his estate with his sons, carried out through cooperative estate planning, is precisely the sort of "debt" section 2053(c)(1)(A) was designed to exclude. See Bank of New York, 526 F.2d at 1018 ("The policy ___ ________________ of section 2053 is to deny a deduction where the underlying transaction was `essentially donative in character.'") (citing H. Rep. No. 2333, 77th Cong., 2d Sess. 169 (1942) (reprinted in 1942-2 Cum. Bull. 372, 493); S. Rep. No. 1631, 77th Cong., 2d Sess. 238 (1942) (reprinted in 1942-2 Cum. Bull. 504, 679)). Nor does the subsequent court-approved settlement with Elizabeth's estate transform the claim into an arm's-length transaction within the meaning of section 2053. The Bank of New ____________ York case again is directly on point: ____ -16- To effectuate the policy underlying the federal estate tax requires that courts look beneath the surface of transactions to discover the essential character of each transfer. Even where a claim is ultimately satisfied by the operation of law, the courts will determine the nature of the claim for federal tax purposes by examining the particular status of the claimant that enabled him to impose his claim on the estate. 526 F.2d at 1017. See also Luce, 444 F. Supp. at 354; cf. ___ ____ ____ ___ Phillips v. Gnichtel, 27 F.2d 662, 663-64 (3d Cir. 1928) ________ ________ (involving transfers made "in contemplation of death," which are included in gross estate except in case of "a bona fide sale for a fair consideration in money or money's worth") ("[W]e [are] inclined to go to the heart of the transaction and find, if we can, just what the parties intended, just what they did and what was the precise result."). Our examination of the issue of arm's-length bargaining helps bring into focus the parties' dispute over consideration. If the reciprocal will agreement did represent collaborative estate planning by the Huntingtons, the fact that Elizabeth received a larger direct bequest than she would have received under Dana's prior will is of no consequence. In such circumstances, the increase would reflect changed priorities rather than a bargained- for "consideration." Cf. Estate of ___ _________ Morse, 69 T.C. at 418 ("[A] consideration hypothetically full and _____ adequate within the statutory meaning has no relevance if the asserted consideration was not part of the bargain between the parties."); Estate of Morse, 625 F.2d at 135 ("[T]he Tax Court ________________ was correct in ruling that it was necessary to show that such -17- consideration was so bargained for . . . .").10 The problem with the Huntington sons' claim therefore may be characterized alternatively as a failure of proof of "full and adequate consideration." We need not decide today whether there may be some factual circumstances in which a claim that began with a wholly discretionary desire to make a bequest can fulfill the requirements of section 2053 for a "bona fide" contract supported by "an adequate and full consideration in money or money's worth." It suffices to say that, in this case, the requisite attributes of a deductible claim were not shown. The decision of the Tax Court is affirmed. _________________________________________ ____________________ 10 In Estate of Morse, decedent and his wife negotiated a _______________ detailed antenuptial agreement to take care of various financial concerns, including the wife's loss of income, upon her remarriage, from a trust established by her former husband. Decedent agreed that, after his death, his wife would receive $12,000 per year during her life from his estate (the same amount as provided by the forfeited trust). The Tax Court held that the commuted value of the wife's right to receive the $12,000 was not deductible for estate tax purposes as a claim against her husband's estate under section 2053. The court rejected the contention that the decedent's right to live in his wife's house rent-free during his life, if he had survived her, was consideration for his agreement to provide her with the $12,000 income. 69 T.C. at 418 ("[A]n examination of the facts and circumstances of this case reveals an absence of bargaining . . . ."). -18-