# United States Tax Court

T.C. Memo. 2023-33

ESTATE OF BERNARD J. MACELHENNY, JR., DECEASED,
DONOR, MICHAEL P. MACELHENNY AND CATHERINE
MACELHENNY DANN, CO-EXECUTORS,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

ESTATE OF BERNARD J. MACELHENNY, JR., DECEASED,
MICHAEL P. MACELHENNY AND CATHERINE MACELHENNY
DANN, CO-EXECUTORS,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 12981-19, 12982-19.          Filed March 15, 2023.

————

*Dennis L. Perez* and *Lacey E. Strachan*, for petitioners.

*Stephen O. Abanise*, *Jenny R. Casey*, and *Kim-Khanh Nguyen*, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

KERRIGAN, *Chief Judge*:  Respondent determined gift tax deficiencies in the Estate of Bernard J. MacElhenny, Jr. (estate), for

[*2] 2011 and 2012 of $188,000 and $3,335,609, respectively.[1] Respondent also determined a $3,992,656 estate tax deficiency. The parties filed Stipulations of Settled Issues, and the remaining issues for consideration in these consolidated cases are whether (1) the estate may properly deduct the value of two consent judgments entered against Bernard J. MacElhenny, Jr. (decedent), and (2) decedent's children received taxable gifts by purchasing property at a discount.

Unless otherwise indicated, all section references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.[2] Decedent, a California resident, died April 27, 2015. Decedent had two children: Michael P. MacElhenny and Catherine MacElhenny Dann. When the Petitions were timely filed, Mr. MacElhenny resided in Arizona and Ms. Dann resided in California.

Mr. MacElhenny and Ms. Dann are co-executors of the estate and co-trustees of the MacElhenny 1999 Trust dated February 3, 1999, whose terms were amended and restated on April 13, 2015. In addition to those duties, Mr. MacElhenny and Ms. Dann acted as decedent's representatives starting on December 22, 2004, when decedent executed a Uniform Statutory Form Power of Attorney.

Decedent was involved in the real estate industry. He started off selling properties but later developed them as well. Mr. MacElhenny also worked in real estate. He started off working for New York-based firms but later formed his own practice in Arizona under the name of Mission Hill Management. Through this business, Mr. MacElhenny

---

[1] A Petition was filed for redetermination of the gift tax deficiency in Docket No. 12981-19 and for redetermination of the estate tax deficiency in Docket No. 12982-19. The Court consolidated the cases on September 8, 2020.

[2] During the trial respondent offered Exhibit 54–R, an appraisal of the El Mercado property. The Court reserved ruling on the admission of Exhibit 54–R. Respondent has withdrawn the request to admit the exhibit.

[*3] purchased and resold various residential and commercial properties.

He also helped manage decedent's Arizona-based properties. Decedent and Mr. MacElhenny co-managed the Arizona properties for approximately eight years until 2010. At that time decedent decided he wanted to take back control, and so Mr. MacElhenny stopped working with him. Around this same time, decedent's health began to decline. The deterioration began with simple cognitive issues but ripened into amnesiac dementia in addition to other health concerns.

In early 2012 decedent had a series of embolic strokes which severely incapacitated him. At this time Mr. MacElhenny and Ms. Dann stepped in to assist decedent. On January 31, 2012, Dr. Robert Harbaugh signed a Capacity Declaration-Conservatorship. Mr. MacElhenny—acting as the primary representative—was to manage decedent's business affairs and Ms. Dann was to tend to decedent's health-related issues.

Mr. MacElhenny was faced with many challenges when he took over decedent's business. The properties were inadequately managed, and the records were not complete. Over a two-month period Mr. MacElhenny categorized decedent's real estate portfolio and prioritized the tasks that needed to be accomplished. In doing so, he discovered several short-term debts, one to Union Bank and the other to Westamerica Bank, that needed to be addressed immediately.

I.    *Union Bank Debt*

On August 7, 2003, decedent and his then business partner Robert O'Neel formed New Healdsburg Venture, LP (New Healdsburg). Decedent and his wholly owned entity Creekside 50 Ltd., LLC (Creekside), were designated the limited partners while Mr. O'Neel's wholly owned entity, New Healdsburg Venture, LLC, was designated the general partner. Upon formation, decedent contributed to the partnership a parcel of vacant land in Healdsburg, California. The plan was to construct residential units on the property and then sell or lease them.

In 2007 New Healdsburg borrowed approximately $11.3 million from Tamalpais Bank, which decedent and Mr. and Mrs. O'Neel guaranteed. In 2010 the partnership defaulted on payments and filed for bankruptcy. This led Tamalpais Bank to file suit against the O'Neels, decedent, and New Healdsburg. During this time Union Bank

[*4] acquired Tamalpais Bank thereby substituting itself as plaintiff in the state court action.

On August 31, 2011, the parties settled the matter, stipulating a $6,500,000 judgment in favor of Union Bank that would be stayed so long as the borrowers paid the bank $3,500,000. The settlement agreement required that payment be made as follows: (1) $500,000 within 45 days of the effective date, August 31, 2011; (2) $2,500,000 by August 31, 2012; and (3) $500,000 by February 28, 2013. If the defendants made the payments as scheduled, Union Bank agreed to release its claim entirely. If they did not, then the judgment would be entered against them. As further security for the settlement payment, the agreement required decedent to pledge his interest in five properties: four in Santa Barbara, California, and one in Tucson, Arizona. Among the Santa Barbara assets was the El Mercado property which is the subject of the gift tax issue here. The El Mercado property is a 45,000-square-foot commercial development in California.

Decedent timely made the first $500,000 payment. On May 21, 2012, Mr. MacElhenny offered $1,800,000 to settle the remainder of the Union Bank debt. He planned to refinance the El Mercado property, which was subject to a mortgage of $1,614,391 owed by decedent, to make the payment. The issue that arose was that the lending institution was willing to lend the funds only if Mr. MacElhenny agreed to sponsor the borrowing entity. Because of decedent's troubled financial state, Mr. MacElhenny was unwilling to personally guarantee any debt on behalf of decedent. Mr. MacElhenny and Ms. Dann then considered the possibility of purchasing the El Mercado property from decedent.

Union Bank ultimately rejected the $1,800,000 offer and counter-offered to settle the claim for $2,750,000. On August 29, 2012, Mr. MacElhenny rejected that offer and made a new offer of $2,500,000. Union Bank rejected this offer as well. On August 31, 2012, Mr. MacElhenny offered the bank $2,000,000 from the El Mercado property refinancing—set to close on September 12, 2012—and $625,000 by year-end which he would personally guarantee. In exchange for the payment, Union Bank would move to dismiss the claim. This offer was modified one additional time to increase the guaranteed payment to $650,000. Union Bank accepted this offer on September 7, 2012.

Mr. MacElhenny's efforts to refinance the El Mercado property ultimately failed. Around this time, Mr. MacElhenny spoke with his

[*5] personal attorney about the most viable and advantageous way to obtain the necessary funds while not becoming an unsecured creditor of decedent. Counsel advised that purchasing the judgment could be an attractive alternative because it would give Mr. MacElhenny priority over other creditors—in that he would be stepping into the shoes of Union Bank—and could be used to offset the purchase price of any estate assets he might wish to purchase.

On September 11, 2012, Mr. MacElhenny informed Union Bank that he was not able to refinance the El Mercado property. He instead proposed to personally fund the entire $2,650,000 and requested that an assignment clause be added to the stipulation. This would state that the bank had assigned the remainder of the judgment in exchange for the $2,650,000 payment. On September 14, 2012, a Union Bank representative indicated that the bank would be willing to accept this offer. On September 20, 2012, however, Union Bank stated that it was only willing to proceed with the transaction as originally proposed sans the assignment provision.

As of September 21, 2012, Union Bank had again changed its course and agreed to include the requested assignment provision in the settlement. Union Bank did not warrant or guarantee that the state court would enter the assigned judgment. To reduce the risk of the state court's not entering the judgment, Mr. MacElhenny and Ms. Dann sought the O'Neels' consent to the assignment. The O'Neels ultimately consented in consideration for a promise by Mr. MacElhenny to not pursue the judgment against them once it had been assigned to him and Ms. Dann.

On September 24, 2012, Mr. MacElhenny's partner wired the $2,650,000 to Union Bank in purchase of the judgment. Union Bank also assigned Mr. MacElhenny and Ms. Dann the liens that it had obtained on the five properties that were pledged in the original settlement agreement. Mr. MacElhenny and Ms. Dann entered into a separate agreement whereby Ms. Dann promised to pay Mr. MacElhenny for her half of the purchase of the judgment.

On September 27, 2012, the parties filed the stipulation with the Sonoma County Superior Court. The state court entered an order on the same day recognizing Mr. MacElhenny and Ms. Dann as the real parties in interest and substituting them in place of Union Bank as plaintiffs in the case. On October 1, 2012, Mr. MacElhenny and Ms. Dann filed the stipulation for entry of judgment. The state court entered the judgment

[*6] in their favor at $6,000,000 with 10% statutory annual interest. The order indicated that both Mr. MacElhenny and Ms. Dann would have undivided 50% interests in the judgment amount.

II.    *Westamerica Bank Debt*

The Westamerica Bank debt arose in manner similar to the Union Bank debt. On August 1, 2003, decedent's wholly owned entity, Creekside, borrowed $1,365,000 from Sonoma Valley Bank. As consideration Creekside executed a deed of trust in favor of the bank for a property in Glen Ellen, California. The parties to the loan transaction twice increased the principal indebtedness, ultimately to $1,800,000. Decedent executed a commercial guaranty as further security for the debt. On February 23, 2006, decedent personally borrowed $1,500,000 from Sonoma Valley Bank. In 2010 Westamerica Bank acquired both loans.

Creekside and decedent both defaulted on their loans. This led Westamerica Bank to record notices of default and elections to sell under deeds of trust. On June 17, 2011, Westamerica Bank filed a complaint in the Sonoma County Superior Court against decedent and Creekside for the $1,365,000 loan. On October 6, 2011, Westamerica Bank filed a second complaint in the same venue against only decedent for the $1,500,000 loan. On March 22, 2012, the state court consolidated the two cases.

On August 9, 2012, the parties settled the matter by stipulating a $1,460,104 judgment. The agreement required payment to be made primarily via sale of the Glen Ellen property and thereafter via monthly cash payments. If the total payment was made by July 31, 2013, Westamerica Bank agreed to release the claim and dismiss the suit. If it was not, then the parties agreed that the bank could have the judgment entered and would have the option to foreclose on the Glen Ellen property. The agreement also provided that if the judgment was entered, Mr. MacElhenny would have the right to purchase the judgment from Westamerica Bank for a period of five days following entry.

In December 2012 Mr. MacElhenny sold the Glen Ellen property, leaving a $527,938 balance owing to the bank. Realizing that decedent was unable to pay the balance, Mr. MacElhenny inquired about purchasing the judgment as permitted by the settlement agreement. He asked whether he could do so at a 10% discount. On July 18, 2013, the

[*7] parties agreed to allow Mr. MacElhenny to purchase the bank's rights to the judgment for $432,000. Before filing the judgment with the court, Westamerica Bank's representatives asked Mr. MacElhenny's attorney whether the judgment should be entered for $432,000 or something higher. The parties ultimately agreed that the sum should be $865,517.

On August 19, 2013, the parties filed the stipulated judgment and assignment with the Sonoma County Superior Court. The stipulation for entry of judgment provided that the judgment would be reduced by a $594,857 credit. This provided Mr. MacElhenny with an $865,517 judgment accruing 10% annual interest. The state court entered the judgment on September 6, 2013. Mr. MacElhenny has not taken any action thus far to collect on this judgment.

III.    *Purchase of the El Mercado Property*

On December 22, 2004, decedent amended and restated the MacElhenny 1999 Trust instrument (2004 restatement). At this time the trust owned the El Mercado property. The 2004 restatement provided that the El Mercado property would pass to Mr. MacElhenny and Ms. Dann upon decedent's death. The 2004 restatement also provided that Mr. MacElhenny, Ms. Dann, and Marcella Wear (a former employee of decedent) would become successor trustees should decedent become unable to act.

On October 26, 2012, the MacElhenny 1999 Trust transferred 50% interests in the El Mercado property to both Mr. MacElhenny and Ms. Dann for a stated price of $4,750,000. The purchase agreement provided that Mr. MacElhenny and Ms. Dann assumed an existing $1,614,391 mortgage and received a $3,135,609 credit for the remainder. The credit comprised (1) the $2,650,000 paid to acquire the Union Bank judgment and (2) a $485,609 offset against the Union Bank judgment.

Simultaneously with the sale, Mr. MacElhenny and Ms. Dann formed El Mercado (Delaware), LLC, and contributed the El Mercado property to it. El Mercado (Delaware), LLC, then borrowed $4,750,000 from UBS Real Estate Securities, Inc., in exchange for a security interest in the El Mercado property. El Mercado (Delaware), LLC, used the borrowed funds to (1) pay off the $1,614,391 mortgage encumbering the El Mercado property and (2) repay Mr. MacElhenny's partner the $2,650,000 used to purchase the Union Bank judgment.

**[\*8]** The parties have since stipulated that each 50% interest in the El Mercado property was worth $3,100,000 and encumbered by a $807,196 mortgage at the time of sale. On June 4, 2014, Mr. MacElhenny and Ms. Dann filed with the state court an acknowledgment of satisfaction of judgment indicating that the judgment should be reduced by $3,135,609.

IV.    *Estate and Gift Tax Returns*

On May 23, 2016, decedent's representatives filed Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return, for the 2011 taxable year. They did not file a Form 709 for the 2012 taxable year. Respondent increased the estate's adjusted taxable gifts by $3,497,609.

On July 22, 2016, the executors of decedent's estate filed Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return. They claimed a $3,638,083 deduction attributable to the remaining value of the Union Bank judgment. They also claimed a $1,007,320 deduction attributable to the Westamerica Bank judgment. Respondent disallowed both deductions.

OPINION

Generally, the Commissioner's determinations set forth in a notice of deficiency are presumed correct, and taxpayers bear the burden of showing the determinations are erroneous. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Section 7491(a) provides an exception that shifts the burden of proof to the Commissioner as to any factual issue relevant to the taxpayer's tax liability if the taxpayer introduces credible evidence with respect to the issue and meets certain other conditions. *See* § 7491(a)(2).

Respondent determined that petitioners were not permitted to deduct the value of the consent judgments from the value of the gross estate. Respondent also determined that Mr. MacElhenny and Ms. Dann received taxable gifts when the MacElhenny 1999 Trust transferred to them interests in the El Mercado property. Petitioners have not produced credible evidence within the meaning of section 7491(a). The burden of proof has therefore not shifted, and so petitioners must show that respondent's determinations are incorrect.

[*9] I.   *The Deductibility of the Consent Judgments*

Respondent asserts that the Union Bank and Westamerica Bank judgments are not deductible by the estate because they involve family members and therefore are not bona fide claims. Petitioners disagree, arguing that the claims are bona fide debts and may properly be deducted from the value of the gross estate.

A.  *Applicable Statute*

Pursuant to section 2001(a) tax may be imposed on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States. A decedent's taxable estate is the value of the decedent's gross estate reduced by certain deductions. § 2051. Section 2053(a)(3) provides that "claims against the estate" may be deducted from the value of the gross estate. When such claims are "founded on a promise or agreement," they are "limited to the extent that they were contracted bona fide and for an adequate and full consideration in money or money's worth." § 2053(c)(1)(A).

The regulations provide that for a claim arising out of contracts or torts to be deductible, the requirements of both Treasury Regulation §§ 20.2053-4 and 20.2053-1 must be followed. Treas. Reg. § 20.2053-4(a)(1). This means that the claims must (1) "represent a personal obligation of the decedent existing at the time" of death; (2) be "enforceable against the decedent's estate (and . . . not unenforceable when paid)"; and (3) have been actually paid by the estate or be "ascertainable with reasonable certainty and will be paid." Treas. Reg. §§ 20.2053-4(a)(1), 20.2053-1(d)(4). No deduction is permitted "to the extent [the claim] is founded on a transfer that is essentially donative in character (a mere cloak for a gift or bequest)." Treas. Reg. § 20.2053-1(b)(2)(i).

"Transactions within a family group are subject to special scrutiny . . . ." *Harwood v. Commissioner*, 82 T.C. 239, 259 (1984), *aff'd without published opinion*, 786 F.2d 1174 (9th Cir. 1986); *see also United States v. Allison*, 587 F. Supp. 3d 1015, 1030 (E.D. Cal. 2022) ("[I]ntra-family agreements are scrutinized closely by courts due to their potential for abuse."). The regulations provide various factors for analyzing whether intrafamily claims are bona fide:

  (A) The transaction underlying the claim or expense occurs in the ordinary course of business, is negotiated at arm's length, and is free from donative intent.

**[\*10]**         (B) The nature of the claim or expense is not related to an expectation or claim of inheritance.

(C) The claim or expense originates pursuant to an agreement between the decedent and the family member, related entity, or beneficiary, and the agreement is substantiated with contemporaneous evidence.

(D) Performance by the claimant is pursuant to the terms of an agreement between the decedent and the family member, related entity, or beneficiary and the performance and the agreement can be substantiated.

(E) All amounts paid in satisfaction or settlement of a claim or expense are reported by each party for Federal income and employment tax purposes, to the extent appropriate, in a manner that is consistent with the reported nature of the claim or expense.

Treas. Reg. § 20.2053-1(b)(2)(ii).

B.    *Analysis*

The estate seeks to deduct the Union Bank and Westamerica Bank judgments as claims against the estate pursuant to section 2053(a)(3).  Because these judgments arose out of breach of contract claims—decedent's failure to repay the funds lent by the banks—the requirements in both Treasury Regulation §§ 20.2053-4 and 20.2053-1 must be satisfied for the claims to be deductible.  Principally the claims must represent bona fide debts of the estate.

A claim founded on a promise or agreement is deductible only to the extent that the claim is "contracted bona fide and for an adequate and full consideration in money or money's worth."  §2053(c)(1)(A); *see Taft v. Commissioner*, 304 U.S. 351, 356 (1938).  The purpose of section 2053 is to prevent deductions under the guise of claims that are either gifts or testamentary dispositions. *Estate of Pollard v. Commissioner*, 52 T.C. 741, 744 (1969).  A deduction is not permissible to the extent that it is founded on a transfer that is donative in character. *Estate of Huntington v. Commissioner*, 16 F.3d 462, 468 (1st Cir. 1994), *aff'g* 100 T.C. 313 (1993).

Respondent asserts that the Union Bank and Westamerica Bank judgments are not bona fide claims against the estate.  Respondent's primary argument is that Mr. MacElhenny and Ms. Dann satisfied the debts once they transferred money to the banks in exchange for the

**[\*11]** purported assignments. Respondent further contends that upon decedent's death, the debts were no longer his personal obligations and therefore were not deductible by the estate. We agree. Because the claims and assignments of claims involve family members, we analyze their validity with a heightened level of scrutiny. *See Harwood*, 82 T.C. at 259. Petitioners have not satisfied their burden of proving that the debts were still decedent's personal obligations at his death. They cannot meet that burden because they satisfied the debts before decedent died.

The claims at issue arose in a commercial lending arrangement: the predecessors to Union Bank and Westamerica Bank lent decedent and his business partners money for their real estate enterprise. After they defaulted on the debts, the lenders sued for breach of contract, among other causes. At that time the claims represented personal obligations of decedent. But once decedent—represented by Mr. MacElhenny and Ms. Dann—settled the debts with the banks, he was no longer personally obligated to make payments towards the judgments. The parties' decision to assign the judgments to Mr. MacElhenny and Ms. Dann did not change this result. The assignments were not made in the ordinary course of business and were not negotiated at arm's length.

The banks wanted the borrowed funds to be repaid. And after significant negotiations, they both accepted a discounted sum in satisfaction of their claims against decedent. While settling the claim via cash payment was an ordinary business transaction, the assignment was not.

In Union Bank's case it initially rejected Mr. MacElhenny's offer to purchase the judgment, preferring instead to release the claim against decedent for an agreed sum of money. Although Union Bank ultimately agreed to assign the claim, it refused to warrant or otherwise represent that the state court would enter the assigned judgment.

With respect to Westamerica Bank, the bank asked Mr. MacElhenny whether it should enter the judgment for the amount of the settlement payment, $432,000, or a higher amount. A payment of $432,000 would have satisfied decedent's liability. Since Westamerica Bank assigned the debt to Mr. MacElhenny and Ms. Dann, a higher amount was not of consequence to Westamerica Bank. As in the case of Union Bank, Westamerica Bank was not requiring an assignment.

**[*12]** Petitioners assert that because the Sonoma County Superior Court entered the assigned judgments, we should find that they are bona fide. We disagree. *See* Treas. Reg. § 20.2053-1(b)(3)(i) ("[A] final judicial decision . . . may be relied upon to establish the amount of a claim or expense that is otherwise deductible under section 2053 and these regulations *provided that the court actually passes upon the facts on which deductibility depends*." (Emphasis supplied)). The state court did not consider whether the claims continued to be decedent's personal obligations after payments were made to the banks. It therefore did not pass upon the facts on which deductibility depends. For that reason we are not inclined to rely upon the entries as evidence that the assigned claims were bona fide. We conclude that neither assignment was an ordinary course of business transaction.

There is no evidence to support petitioners' contention that the assignments were negotiated at arm's length. Mr. MacElhenny was on both sides of the transactions. He agreed on decedent's behalf to have the judgments entered against decedent and in his and Ms. Dann's favor. There is no record of consent by decedent for maintenance of the liabilities after payment. True, Mr. MacElhenny held decedent's power of attorney and so had the authority to make these decisions on decedent's behalf. It is also true that Mr. MacElhenny employed multiple attorneys to represent the competing interests involved. But we do not see any evidence that these individuals actually negotiated amongst themselves.

We note that the consent judgments entered against decedent did not resolve a dispute between decedent and his children. Mr. MacElhenny contends that he did not want to take over his father's debts. At the time of the assignments for both claims, agreement had been reached regarding settling the debts with the banks. When an agreement was reached with Union Bank, Mr. MacElhenny's plan to refinance the El Mercado property and transfer ownership was in the works. The El Mercado property was transferred one month after the assignment of the Union Bank claim, and Mr. MacElhenny and Ms. Dann were repaid one month later. Thus, although Mr. MacElhenny did eventually become a creditor of decedent, he and Ms. Dann were repaid in short order.

The motivation for the assignments was donative, and structuring the transactions in this manner served only as a cloak for a gift from decedent to his children. At the time of the settlement negotiations of the claims, Mr. MacElhenny and Ms. Dann were acting

[*13] under decedent's power of attorney.[3] This made them interested in both settling the debt on decedent's behalf and trying to preserve it for their own benefit. Had decedent still been competent, it is difficult to imagine that he would have agreed to pay off the banks yet not have the claims dismissed or at least reduced by the payments. If anything, this seems to have been only a manner of creating a debt in favor of decedent's children which they could use to offset the purchase price of estate assets. It also created a significant deduction against the value of the gross estate which would as well serve to enhance Mr. MacElhenny and Ms. Dann's inheritance.

In any event, we do not think that the estate would be entitled to deduct the claims because it did not itself pay any money towards them. Mr. MacElhenny and Ms. Dann did when they were assigned the judgments. For the Union Bank debt Mr. MacElhenny and Ms. Dann borrowed money from Mr. MacElhenny's partner. For the Westamerica Bank debt they allegedly borrowed money from their mother. In either case, petitioners do not contend that the estate is out any money because of the claims. They instead assert that the estate will satisfy the amounts remaining owed once these cases are resolved. Given that Mr. MacElhenny and Ms. Dann have not taken any actions to collect thus far—and likely will not because they are on both sides of the claims—we do not think that there is any reasonable certainty of payment, and so the claims would not be deductible anyway. *See* Treas. Reg. § 20.2053-1(d)(4)(i).

All of these facts lead us to the conclusion that the debts in these cases—the ones incurred by decedent—were extinguished when Mr. MacElhenny and Ms. Dann paid the $2,650,000 and $432,000 to Union Bank and Westamerica Bank, respectively. Since the claims were no longer decedent's personal obligations, we agree with respondent that the estate improperly deducted them.

II.    *The Sale of the El Mercado Property to Mr. MacElhenny and Ms. Dann*

On October 26, 2012, Mr. MacElhenny and Ms. Dann, as trustees of decedent's revocable trust, transferred the El Mercado property subject to a mortgage of $1,614,391 to themselves as joint owners. Then

---

[3] On December 22, 2004, decedent appointed Mr. MacElhenny—or alternatively if he could not act, Ms. Dann—as his representative to act for him with respect to the grant of powers given in the Uniform Statutory Form Power of Attorney.

[*14] they transferred the property to El Mercado (Delaware), LLC, of which they were equal owners. The transfer was structured as a sale with a price of $4,750,000. Mr. MacElhenny and Ms. Dann paid $1,614,391 to discharge decedent's existing mortgage, paid $2,650,000 to Union Bank in settlement of decedent's liability as a guarantor, and reduced the outstanding amount of the Union Bank judgment by $485,609. Respondent contends the amount of consideration is limited to the $1,614,391 paid to satisfy the existing mortgage plus the $2,650,000 paid to Union Bank. Respondent says this resulted in Mr. MacElhenny's and Ms. Dann's each receiving a $967,805 taxable gift. We agree.

Section 2501 provides for the imposition of tax on gifts made by individuals. Pursuant to section 2512(a), "[i]f the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift." Section 2512(b) provides:

> Where property is transferred for less than an adequate
> and full consideration in money or money's worth, then the
> amount by which the value of the property exceeded the
> value of the consideration shall be deemed a gift, and shall
> be included in computing the amount of gifts made during
> the calendar year.

The regulations provide that the gift tax is not confined only to transfers which accord with the common law concept of gifts. Treas. Reg. § 25.2512-8. The regulation "embrace[s] as well sales, exchanges, and other dispositions of property for a consideration to the extent that the value of the property transferred by the donor exceeds the value in money or money's worth of the consideration given therefor." *Id.* That said, transfers "made in the ordinary course of business (a transaction which is bona fide, at arm's length, and free from any donative intent), will be considered as made for an adequate and full consideration in money or money's worth." *Id.* We review intrafamily transfers with a heightened level of scrutiny. *See Harwood*, 82 T.C. at 259.

Since we conclude that the Union Bank claim was not a bona fide liability, a reduction in the judgment amount cannot replenish or augment the donor's taxable estate. The reduction in debt is therefore not consideration in money and or money's worth for decedent's gift of El Mercado to his children. On that basis, we sustain respondent's finding that Mr. MacElhenny and Ms. Dann received taxable gifts of $967,805 each.

**[\*15]** III.   *Conclusion*

We conclude that petitioners have failed to carry their burden of proof as to the deductibility of the judgments rendered against decedent. They may not reduce the value of the gross estate by the value of the claims.  On the basis of that finding we also hold that they received taxable gifts in their discounted purchase of the El Mercado property.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*