Estate of Ervin A. **REINKE,** Deceased; **Marion Reinke,** Personal Representative; **Marion Reinke,** Appellants,

v.

**COMMISSIONER OF INTERNAL REVENUE,** Appellee.

No. 94–1403.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 14, 1994.

Decided Jan. 26, 1995.

Garry A. Pearson, Grand Forks, ND, argued, for appellant.

Jonathan S. Cohen, Washington, DC, argued (Gary R. Allen and Sally Schornstheimer on the brief), for appellee.

Before BEAM, Circuit Judge, FRIEDMAN *, Senior Circuit Judge and MORRIS SHEPPARD ARNOLD, Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

This case involves the federal income tax treatment of payments received under coal

* DANIEL M. FRIEDMAN, Senior Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation.

lease agreements pursuant to which coal was removed from the land by strip mining. The dispute relates to payments that reflected only the surface rights the appellants had in the land. The appellants contend that the payments were for damages inflicted on the land by the mining, and therefore constituted a return of capital up to the amount of their basis in the land and capital gains thereafter. The Tax Court held, however, that the payments constituted ordinary income. It further held that the Commissioner of Internal Revenue properly imposed the 25 percent addition to tax that 26 U.S.C. § 6661(a) (1988) provides for substantial understatement of tax. We affirm both rulings.

# I

A. The facts were stipulated. In 1961 Mr. Reinke, deceased, and his wife, who filed joint returns, entered into a coal lease agreement covering the southeast quarter of 480 acres in North Dakota. The lease authorized the lessees to remove any and all lignite coal from the land "by strip mining or otherwise." The lessees agreed to pay the Reinkes

> ... As royalty for coal, the sum of ten cents (10¢) per ton * * * for all coal removed from said land, and as rental payments and damages for any surface used, occupied or destroyed in the mining and removal of any coal in and underlying lessor's said lands.

The lease provided that if the Reinkes owned less than 100 percent of the coal under the land, then the "royalties and rents to be paid as herein provided" would be proportionately reduced.

In 1971 the Reinkes entered into a coal lease agreement with the assignee (Baukol-Noonan, Inc.) of the lessee of the first lease, covering two additional quarter sections. In those two sections the Reinkes owned only the surface, but not the mineral rights in the land. The 1971 lease provisions here involved are identical to those in the 1961 lease, except that there was added to the provision relating to less than one hundred percent ownership of the coal the following statement: "Provided, However, that the royalty paid to the lessor herein shall never be less than 2¢ per ton of coal".

In 1975, North Dakota enacted the Surface Owners Protection Act, which imposed various legal and financial obligations on mineral developers, designed to protect surface owners from "the undesirable effects of development, without their consent, of minerals underlying their surface". N.D.Cent.Code § 38–18–03 (1987). In 1979 the Reinkes entered into an agreement with their lessee which, to resolve the uncertainty whether the North Dakota statute required the lessee to pay the Reinkes "surface damages for the use of the surface in the course of mining the real property covered by its coal lease," provided in pertinent part:

> 1. BN will pay to the surface owner ten cents a ton for every ton of coal actually mined and removed from the property on and after October 1, 1979, with the payments to be made on a monthly basis commencing on November 15, 1979.

> 2. The surface owner agrees that such payment by BN to him shall constitute all of the payments or damages to which he is entitled by virtue of NDCC 38–18–07(1) and NDCC 38–18–06(5).

B. In their federal income tax returns for 1985, 1986 and 1987, the Reinkes reported the amounts received under the foregoing coal lease agreements as follows:

|  | Capital Gains | Rents & Royalties |
|---|---|---|
| 1985 | $254,531 | $–0– |
| 1986 | 296,796 | 9,021 |
| 1987 | 71,431 | 780 |

The Commissioner of Internal Revenue assessed deficiencies for those three years totalling $112,089.42 and additions to tax under Section 6661(a) totalling $28,022.00. The Commissioner determined that all of the payments made with respect to the property in which the Reinkes owned only surface rights, and one-half of the payments made with respect to the property in which they owned both surface and mineral rights, were ordinary income.

The Reinkes sought redetermination by the Tax Court of these deficiencies in tax and the additions to tax. The Tax Court agreed with the Commissioner that the payments were ordinary income and that the Reinkes were liable for the 25 percent addition to tax.

With respect to the issues before us, the Tax Court held: (1) "At least for the purposes of this case, we are prepared to assume that strip mining necessarily results in" damage to the surface of the land. "The record herein is totally lacking any evidence sufficient to permit us to make an estimate of the measure of such damage." (2) The Commissioner correctly imposed the 25 percent addition to tax because (a) there was a substantial understatement of tax and (b) the Commissioner did not abuse his discretion in not waiving the addition, "particularly since there is no indication that a waiver was ever requested."

## II

The appellants do not challenge the Commissioner's determination that 50 percent of the amounts paid for coal removed from the land in which the Reinkes owned the mineral rights constituted capital gains. The issue therefore is whether the Tax Court correctly held that the remaining amount received on that land and the entire amount received for mining on the other two quarters in which the Reinkes had only the surface rights, were ordinary income. The appellants contend that all of these payments—or at least a part of them—were for damage to the land caused by the mining and that payments for damage to a capital asset are entitled to capital gains treatment. We need not consider the latter issue, however, because the underlying predicate for the argument—that the payments were for damages to the land—is not established by the record.

A. Both coal lease agreements stated that the 10¢ per ton payments were "as royalty for coal … and as rental payments and damages for any surface used, occupied or destroyed in the mining and removal of any coal." Since no coal royalties were payable with respect to the two quarters in which the Reinkes owned only the surface rights and the Commissioner gave capital gains treatment for the portion of the payments on the other quarter that did represent royalties for coal, all of the payments here at issue necessarily constituted "rental payments and damages for any surface used, occupied or destroyed" in the mining.

As the Tax Court correctly held, there is no evidence in the record showing what portion of these payments was for rent and what portion was for damages to the land, or evidence that would permit the court to estimate the portion that represented damages. The Reinkes "had the burden of proving facts essential to bring themselves within the section of the statutes providing for capital gains treatment as claimed." *Estate of Carter v. Commissioner*, 298 F.2d 192, 195 (8th Cir.), *cert. denied*, 370 U.S. 910, 82 S.Ct. 1257, 8 L.Ed.2d 404 (1962).

The only reference to damages in the stipulation of facts is a statement of one of the appellants' contentions. The second sentence of Paragraph 13 states: "Petitioner contends that all surface only payments are for surface damages and constitute a return of capital with any excess subject to capital gains treatment." There are no facts to show even the existence of damage resulting from the mining, let alone the amount or the portion thereof for which the payments were intended to compensate.

■ The appellants contend, however, that the 1979 agreement, which stated that the 10¢ per ton payments for coal mined and removed on and after October 1, 1979, would constitute "all of the payments for damages" to which the Reinkes were entitled under the North Dakota Surface Owners Protection Act, established that the payments here were for damages to the land. The appellants read too much into that agreement. Its stated purpose was to eliminate "uncertainty" over whether that Act "requir[ed] BN to pay to the surface owner surface damages for the use of the surface in the course of mining the real property covered by its coal lease, even though BN might not have been obligated to do so at all or to the same extent under the laws pertaining to contracts and real property in existence prior to the enactment of the act." In other words, the provision was designed to preclude the Reinkes from seeking additional amounts from BN as damages under the North Dakota statute. It cannot properly be read, however, as showing that all of the payments made under the earlier coal lease agreements were for damages to the land.

B.  The appellants contend that the Commissioner and the Tax Court should have estimated what portion of the payments was for damage to the land.  They invoke *Cohan v. Commissioner*, 39 F.2d 540 (2nd Cir.1930).  *Cohan*, however, does not aid them.

*Cohan* involved the deductibility of business expenses incurred by the famous theatrical manager and producer George M. Cohan.  The court, in an opinion by Judge Learned Hand, described these expenses as follows:

> In the production of his plays Cohan was obliged to be free-handed in entertaining actors, employees, and, as he naively adds, dramatic critics.  He had also to travel much, at times with his attorney.  These expenses amounted to substantial sums, but he kept no account and probably could not have done so.  At the trial before the Board [of Tax Appeals] he estimated that he had spent eleven thousand dollars in this fashion during the first six months of 1921, twenty-two thousand dollars between July first, 1921, and June thirtieth, 1922, and as much for his following fiscal year, fifty-five thousand dollars in all.  The Board refused to allow him any part of this, on the ground that it was impossible to tell how much he had in fact spent, in the absence of any items or details.

*Id.* at 543.

The court held that the Board erred in so ruling, *id.* at 544. and remanded for the Board to reconsider the evidence "to make some allowance for the expenses of travel and the like."  *Id.* at 546.  The court explained:

> The question is how far this refusal is justified, in view of the finding that he had spent much and that the sums were allowable expenses.  Absolute certainty in such matters is usually impossible and is not necessary; the Board should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making.  But to allow nothing at all appears to us inconsistent with saying that something was spent.  True, we do not know how many trips Cohan made, nor how large his entertainments were; yet there was obviously some

basis for computation, if necessary by drawing upon the Board's personal estimates of the minimum of such expenses.  The amount may be trivial and unsatisfactory, but there was basis for some allowance, and it was wrong to refuse any, even though it were the traveling expenses of a single trip.  It is not fatal that the result will inevitably be speculative; many important decisions must be such.

*Id.* at 543–44.

Assuming without deciding that the *Cohan* rule may be applied in determining whether particular income constitutes ordinary income or capital gain, the present case is unlike *Cohan* in a critical respect.  Although Cohan was unable to provide a detailed account of his expenditures, he did give overall dollar estimates of his total expenses for the periods in question and the Board found that he had established allowable expenses.  The Second Circuit reversed the Board for denying the deductions because there was no detailed evidence of the amount actually spent.

■  In the present case, however, the appellants presented no evidence at all that would permit an informed estimate of what portion of the payments was for rent and what portion was for damages to the land.  *See Norgaard v. Commissioner*, 939 F.2d 874, 879–80 (9th Cir.1991) (Tax Court correctly refused to permit deduction of estimated gambling losses from reported and unreported gambling income; "Neither winnings nor losses can reasonably be estimated in the absence of a credible basis for doing so" (footnote omitted)).  As the Ninth Circuit stated in a case where proof was similarly lacking, "to allow the *Cohan* doctrine to be invoked by the taxpayers would be in essence to condone the use of that doctrine as a substitute for the burden of proof.  This the court will not do."  *Coloman v. Commissioner*, 540 F.2d 427, 431–32 (9th Cir.1976).

The broad language in *Cohan* quoted above, upon which the appellants rely, must be read in light of the issue before the court in that case.  *Landgraf v. USI Film Products*, ⸺ U.S. ⸺, ⸺, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994).  In that con-

text it does not support the appellants' argument that, under the significantly different facts of the present case, there should have been an estimated allocation of the payments between rent and damages to the land.

## III

A. Section 6661(a) of the Internal Revenue Code of 1986, 26 U.S.C. § 6661(a) (1988) provides:

(a) *Addition to Tax.*—If there is a substantial understatement of income tax for any taxable year, there shall be added to the tax an amount equal to 25 percent of the amount of any underpayment attributable to such understatement.

Section 6661(b)(1) states that an understatement of income tax is "substantial" if it exceeds ten percent of the correct tax or $5,000.00. Section 6661(b)(2)(B) states that the amount of understatement shall be reduced by the portion of the understatement attributable to—

(i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, or

(ii) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return.

There is no dispute that the amount of the Reinkes' understatement of income tax was "substantial" under this definition. The appellants contend, however, that they satisfied the requirements of subsections (B)(i) and (ii) because there was substantial authority for their treatment of the payments as capital gains and they disclosed the relevant facts regarding this tax treatment in their returns. The Tax Court correctly rejected these contentions.

■ The contention that there was substantial authority for treating the payments as capital gains rests on the claim in their brief that "*all* the authorities agree that compensation received for damages to capital assets is capital gain." (Emphasis added). As we have concluded, however, the record does not show that the payments, or what portion of them, were for damages to the

land. Accordingly the Reinkes did not have substantial authority for treating the payments as capital gains. *Antonides v. Commissioner,* 893 F.2d 656, 660 (4th Cir.1990) (cases taxpayer cited were factually distinguishable, so no substantial authority to support taxpayer's treatment of deductions).

■ The Tax Court also properly concluded that the Reinkes "did not disclose the relevant facts" in their returns. To satisfy the disclosure requirement, the tax return must at least provide sufficient information to enable the Commissioner to identify the potential controversy involved. *Schirmer v. Commissioner,* 89 T.C. 277, 285–86, 1987 WL 43886 (1987); *Accardo v. Commissioner,* 942 F.2d 444, 453 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1266, 117 L.Ed.2d 494 (1992). *See also* 26 C.F.R. § 1.6661–4(b) (1994). The Reinkes' returns for the three years involved gave no information about the nature of the payments received or the coal lease agreements. Instead, they merely stated the amounts received and how the Reinkes characterized them, i.e, as "capital gains" or "rents" and "royalties". They did not disclose to the Commissioner the possible issue whether those amounts constituted capital gains or ordinary income, or provide the facts relevant to such a determination. *See Schirmer,* 89 T.C. at 286.

B. Section 6661(c) provides that the Commissioner

… may waive all or any part of the addition to tax provided by this section on a showing by the taxpayer that there was reasonable cause for the understatement (or part thereof) and that the taxpayer acted in good faith.

■ The decision whether to waive the addition to tax is within the discretion of the Commissioner. *Accardo,* 942 F.2d at 454. Since the Reinkes never asked the Commissioner to waive the addition to tax, it is difficult to fault the Commissioner for failing to waive. In any event, the Tax Court correctly held that the appellants had not shown reasonable cause for the Reinkes' understatement of the tax.

The appellants contend that the penalty should have been waived because the Reinkes relied upon a tax return preparer, an attorney. As the Tax Court correctly ruled, however:

Reliance upon the advice of an attorney or accountant constitutes a showing of reasonable cause and good faith under section 6661(c) only if, "under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." Sec. 1.6661–6(b), Income Tax Regs.

Aside from the fact that the returns for the years at issue show the name of a law firm as the employer of the return preparer, the record is totally devoid of any evidence as to the qualifications or competence of the preparer, the extent to which the Reinkes relied on that person's advice or that of any other qualified person, or of their own background. Nor have the appellants shown that the preparer was supplied with sufficient information to make an informed judgment about the treatment of the receipts in question. Under these circumstances, we are unwilling to conclude that there was an abuse of discretion in not waiving the section 6661 addition to tax.

The decision of the Tax Court is affirmed.