# United States Tax Court

T.C. Memo. 2026-26

ROYALTY MANAGEMENT INSURANCE COMPANY, LTD.,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

JOHN B. SHEPERD AND ANDREA SHEPERD,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 3823-19, 4421-19.                    Filed March 26, 2026.

————

*H. Craig Pitts* and *Mark A. Weitz*, for petitioners.

*Ann L. Darnold*, *Lisa R. Jones*, and *Alicia H. Eyler*, for respondent.

## MEMORANDUM OPINION

LAUBER, *Judge*: These consolidated cases involve a microcaptive insurance arrangement.[1]  In this Opinion we address an issue

---

[1] "A 'captive insurance company' is a corporation whose stock is owned by one or a small number of companies and which handles all or a part of the insurance needs of its shareholders or their affiliates." *Caylor Land & Dev., Inc. v. Commissioner*, T.C. Memo. 2021-30, 121 T.C.M. (CCH) 1205, 1207 n.4 (citing *Harper Grp. v. Commissioner*, 96 T.C. 45, 46 n.3 (1991), *aff'd*, 979 F.2d 1341 (9th Cir. 1992)).  "A 'microcaptive' is a small captive insurance company," i.e., one that "take[s] in less than $1.2 million in premiums." *Id.* (citing *Avrahami v. Commissioner*, 149 T.C. 144, 179 (2017)).  For tax years after December 31, 2016, Congress raised the premium ceiling to $2.2 million

**[\*2]** reserved in our prior opinion, *Royalty Management Insurance Co. v. Commissioner*, T.C. Memo. 2024-87. We there held that the corporate petitioner (RMIC) was not "an insurance company" for Federal income tax purposes. And we held that amounts paid to it by Sheperd Royalty, a passthrough entity owned by the Sheperds, the individual petitioners, "did not constitute 'insurance premiums' deductible under section 162." *Id.* at \*37.

Because the cases were "bereft of evidence pointing to the existence of true 'insurance,'" we sustained respondent's deficiency determinations for 2012. *Id.* at \*49–50. We also sustained the imposition of a 20% penalty for negligence or a substantial understatement of income tax, rejecting petitioners' "reasonable cause" defense predicated on alleged reliance on professional advice. *See* § 6662(a) and (b)(1) and (2); *Royalty Mgmt.*, T.C. Memo. 2024-87, at \*51–53. But we deferred ruling on whether we should sustain the 40% accuracy-related penalty that applies in the case of a tax underpayment attributable to a "nondisclosed noneconomic substance transaction." *See* §§ 6662(b)(6), (i), 7701(o); *Royalty Mgmt.*, T.C. Memo. 2024-87, at \*53–54.

In November 2025 this Court provided further guidance about the proper interpretation and application of sections 7701(o) and 6662(i). *See Patel v. Commissioner*, Nos. 24344-17, et al., 165 T.C. (Nov. 12, 2025). We there held that section 7701(o) requires us to make a relevancy determination before deciding whether a challenged transaction lacks economic substance, and we held that the 40% penalty applies if the disallowance of claimed tax benefits is by reason of a transaction lacking economic substance. *See Patel*, 165 T.C., slip op. at 15–19. We also addressed what constitutes "adequate disclosure" under section 6662(i)(2). *Patel*, 165 T.C., slip op. at 27–30. On January 5, 2026, the parties at our request filed Supplemental Memoranda addressing the impact of *Patel* on these cases. Having considered those filings and the record as a whole, we will sustain respondent's determination of a 40% penalty.

---

and added certain diversification requirements to make a section 831(b) election. *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. Q, § 333(b), 129 Stat. 2242, 3108 (2015). These changes have no bearing on the 2012 tax year at issue.

Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. We round most monetary amounts to the nearest dollar.

**[\*3]**                                      *Background*

We adopt the findings of fact set forth in *Royalty Management*, T.C. Memo. 2024-87, repeating such facts only as necessary for clarity and convenience.

*Discussion*

The Code imposes a 20% penalty on the portion of an underpayment of tax required to be shown on a return attributable to "[a]ny disallowance of claimed tax benefits by reason of a transaction lacking economic substance (within the meaning of section 7701(o)) or failing to meet the requirements of any similar rule of law." *See* § 6662(a), (b)(6). Section 6662(i) increases the penalty to 40% if the underpayment is attributable to a "nondisclosed noneconomic substance transaction." Section 6662(i)(2) defines a "nondisclosed noneconomic substance transaction" as one with respect to which the relevant facts affecting the tax treatment are not adequately disclosed in the return or in a statement attached to the return.

Section 7701(o) codifies the "economic substance" doctrine. That provision, applicable to "any transaction to which the economic substance doctrine is relevant," provides a conjunctive test whereby a transaction is treated as having economic substance only if (1) the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position and (2) the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into the transaction. § 7701(o)(1). "The determination of whether the economic substance doctrine is relevant . . . shall be made in the same manner as if [section 7701(o)] had never been enacted." § 7701(o)(5)(C).

I.     *Relevancy Determination*

This Court recently held that the codified economic substance doctrine "is relevant" to insurance arrangements, including microcaptive arrangements of the sort involved here. *See Patel*, 165 T.C., slip op. at 16–22. Petitioners challenge this holding, urging that the economic substance doctrine is not relevant to "choices among legal alternatives in the Code." They contend that section 831(b), which provides tax

[*4] benefits for small insurance companies, "must be applied as written, and the economic substance doctrine cannot be made relevant."[2]

The Court considered and rejected a similar argument in *Patel*. The taxpayers there argued that, by creating a microcaptive company, they had engaged in a "Congressionally induced" or "Congressionally incentivized" arrangement. *See Patel*, 165 T.C., slip op. at 22. In their view, Congress could not have intended that an arrangement it encouraged could be challenged as lacking economic substance. We rejected this argument, explaining:

> The "inducement" cited by the [taxpayers] is the tax treatment of insurers under section 831(b). For small insurers, section 831(b) imposes tax on investment income in lieu of taxable income as otherwise defined in section 832. But the primary issue in these cases is the deductibility of purported insurance premiums reported as ordinary and necessary business expenses under section 162. Further, we previously concluded that the premiums paid and deducted by the [taxpayers] did not constitute insurance for [F]ederal tax purposes. The [taxpayers] do not direct us to any congressional inducement to claim deductions for premiums for purported insurance that is not, in fact, insurance.

*Id.* (citation omitted).

Petitioners advance the same argument here, and in so doing they similarly beg the question. There is no doubt that Congress conferred tax benefits on "small insurance companies." But the central question in these cases is whether RMIC was a genuine "insurance company" qualifying for such benefits. If it was not an "insurance company" for Federal tax purposes, the arrangement was not one that Congress can be said to have "authorized" or "incentivized" in section 831(b). We have held that RMIC was not an "insurance company" within the meaning of section 831(b). *See Royalty Mgmt.*, T.C. Memo. 2024-87, at *49–50. We thus reject petitioners' relevancy argument, adhering to our precedential ruling in *Patel*.

---

[2] Petitioners alternatively argue that the substance-over-form doctrine (or similar rule) better suits these cases. Because we hold that the economic substance doctrine applies to microcaptive insurance arrangements, we need not address petitioners' alternative argument. *See Patel*, 165 T.C., slip op. at 19.

**[\*5]** II.    *Economic Substance*

Having answered the relevancy question in the affirmative, we now evaluate petitioners' captive insurance arrangement under the standards set forth in section 7701(o)(1).  Petitioners neglected to address this issue in their Posttrial Briefs, and they again failed to address it in their Supplemental Memorandum.  Because petitioners bear the burden of proof, we could treat their failure to advance any argument on this point as fatal to their case.[3]

We will nevertheless consider the "economic substance" question on its merits.  Because section 7701(o)(1) sets forth a conjunctive test, petitioners must satisfy both prongs to prevail.  They satisfy neither.

A.    *Objective Test: Change in Economic Position*

The first question is whether the microcaptive arrangement changed the Sheperds' economic position in a meaningful way, apart from the tax benefits they sought to achieve.  § 7701(o)(1)(A).  "[T]ransactions lack objective economic reality if they 'do not vary[,] control[,] or change the flow of economic benefits.'"  *Patel*, 165 T.C., slip op. at 23 (alterations in original) (quoting *Southgate Master Fund, L.L.C. ex rel. Montgomery Cap. Advisors, LLC v. United States*, 659 F.3d 466, 481 (5th Cir. 2011); *see also Sala v. United States*, 613 F.3d 1249, 1253 (10th Cir. 2010) ("[T]ransactions lacking an appreciable effect, other than tax reduction, on a taxpayer's beneficial interest will not be recognized for tax purposes." (citing *James v. Commissioner*, 899 F.2d 905, 908 (10th Cir. 1990), *aff'g* 87 T.C. 905 (1986))).  "This is an objective inquiry into whether the transaction either caused real dollars to meaningfully change hands or created a realistic possibility that they would do so."  *Patel*, 165 T.C., slip op. at 23 (quoting *Southgate Master Fund, L.L.C.*, 659 F.3d at 481).  A "circular flow of funds among related entities" may be a strong indication that a transaction lacks economic substance.  *Id.*

---

[3] *See, e.g.*, *Estate of Spizzirri v. Commissioner*, T.C. Memo. 2023-25, at \*17 & n.9 (first citing *Clay v. Commissioner*, 152 T.C. 223, 236 (2019), *aff'd*, 990 F.3d 1296 (11th Cir. 2021); and then citing *Dutton v. Commissioner*, 122 T.C. 133, 142 (2004)) ("The [taxpayer] has failed to develop this argument and, consequently, has forfeited the issue."), *aff'd*, 136 F.4th 1336 (11th Cir. 2025); *Riley v. City of Kokomo*, 909 F.3d 182, 190 (7th Cir. 2018) ("It is not the obligation of [this] court to research and construct the legal arguments open to parties, especially when they are represented by counsel." (quoting *Beard v. Whitley Cnty. REMC*, 840 F.2d 405, 408–09 (7th Cir. 1988))).

**[\*6]** (quoting *Merryman v. Commissioner*, 873 F.2d 879, 882 (5th Cir. 1989), *aff'g* T.C. Memo. 1988-72).

For several reasons we conclude that the microcaptive arrangement did not meaningfully change the Sheperds' economic position. First, they secured no insurance protection by paying $1,099,900 of "premiums" to CCFC Insurance. RMIC purported to reinsure risks that CCFC Insurance supposedly ceded to it. But CCFC Insurance did not exist during calendar year 2012, the tax year at issue. *See Royalty Mgmt.*, T.C. Memo. 2024-87, at \*13, \*36. When created in 2013, CCFC Insurance was organized as an ordinary "domestic corporation" under the jurisdiction of the Sac and Fox Nation. *Ibid.* The Sac and Fox Nation has no insurance regulatory authority, and there is no evidence that CCFC Insurance was ever licensed or regulated as an insurance company. *Ibid.* Because CCFC Insurance was not an "insurance company" during 2012 or 2013, the Sheperds secured no insurance protection by paying "premiums" to it.

Under the putative reinsurance agreement between CCFC Insurance and RMIC, 100% of the risk of loss was supposedly shifted to RMIC, the putative reinsurer. But RMIC had initial capitalization of zero and no paid-in capital. *See id.* at \*14–15, \*31. Its only assets consisted of "reinsurance premiums" and modest investment income ($252 during 2012). *Id.* at \*37. As a result, RMIC was financially capable of paying claims only by returning to Sheperd Royalty the "reinsurance premiums" that Sheperd Royalty had routed to RMIC through CCFC Insurance. *Ibid.*

In a genuine reinsurance arrangement, the primary insurer remains liable if the reinsurer cannot pay, and risk transfer can arise in that way. But that was not true here. Article X(E) of the Reinsurance Agreement provided that, "[i]n the event Reinsurer [RMIC] becomes insolvent, the shareholders of such Reinsurer shall be liable for any amounts due to Ceding Company [CCFC Insurance] by Reinsurer, as a result of undercapitalization of Reinsurer." *Id.* at \*38. Mr. Sheperd was RMIC's sole shareholder, and RMIC was severely undercapitalized. The Reinsurance Agreement thus made him personally liable for, and pro tanto relieved CCFC Insurance of liability for, any approved claims that RMIC was unable to pay. *Ibid.* There was thus no transfer of risk either to RMIC or to CCFC Insurance.

Sheperd Royalty was a passthrough entity wholly owned by the Sheperds. Because Sheperd Royalty achieved no risk transfer by paying

[*7] $1,099,900, and because that payment (less various fees) was directed to an affiliate wholly owned by Mr. Sheperd, the payment was economically equivalent to establishing a reserve for self-insurance. Indeed, setting aside the hoped-for tax benefits, Mr. Sheperd would have been better off, in two respects, if he had simply deposited $1,099,900 in a bank account and saved it for a rainy day. First, he would not have had to pay $75,893 in fees to Cary Cope for creating the bogus insurance arrangement. Second, by signing the reinsurance agreement, he made himself personally liable for any Sheperd Royalty losses that could not be defrayed out of the RMIC self-insurance reserve. He thus forfeited pro tanto the limitation on personal liability that he achieved by organizing Sheperd Royalty as a limited liability company.

Finally, in economic terms the microcaptive arrangement was simply a circular flow of funds from Sheperd Royalty to CCFC Insurance to RMIC and then back to the Sheperds, who owned Sheperd Royalty. *Id.* at *48–49. Virtually all these funds were used for Mr. Sheperd's personal benefit and for the benefit of his immediate family. *Id.* at *49. As we found in *Patel*, 165 T.C., slip op. at 23–24, a circular flow of funds among related entities does not result in a meaningful change to economic position.

In sum, petitioners secured no insurance benefit—and no other economic benefit, apart from hoped-for tax deductions—by entering into the microcaptive arrangement. Indeed, ignoring the tax benefits, they were guaranteed to be in a worse economic position by paying "premiums" of $1,099,900 than if they had simply held on to the cash. They woefully fail the objective prong of the economic substance inquiry.

### B. *Subjective Test: Tax Avoidance*

Petitioners' failure of the objective test is reason enough to conclude that the microcaptive arrangement lacked economic substance. *See id.*, slip op. at 24. For the sake of completeness, however, we will examine whether the Sheperds, in a subjective sense, had a substantial purpose (apart from Federal income tax effects) for entering into the transactions. *See* § 7701(o)(1)(B); *cf. Mukhi v. Commissioner*, 163 T.C. 150, 162 (2024) (noting that all of a party's alternative arguments may be addressed even if they lead to the same outcome), *supplementing* 162 T.C. 177 (2024). We find that petitioners had no substantial purpose apart from avoiding taxes.

**[\*8]**    First, the title warranty risk Mr. Sheperd bore under the lease assignment contracts was minuscule. *See Royalty Mgmt.*, T.C. Memo. 2024-87, at \*8–9. Each lessor warranted good title to Sheperd Royalty; if Cordillera ever made a title claim against Sheperd Royalty, Sheperd Royalty had a dollar-for-dollar claim against the lessor. *Id.* at \*9. In any event, each mineral lease was exhaustively researched for title defects by Pinson, a highly regarded "petroleum landman" firm, which insisted that any title defects be fixed before a lease could be assigned to Cordillera. *Ibid.* The record contains no evidence of a single title deficiency in any of the 500+ leases that were examined by Pinson and assigned to Cordillera. *Ibid.* Given the minuscule nature of the title risk, no rational person would have paid $1,099,900 of insurance premiums to guard against that risk.[4]

Second, Mr. Sheperd expressed little curiosity about the specifics of the insurance coverage. *Id.* at \*26. CCFC never completed a feasibility study to assess the costs and benefits of the microcaptive arrangement. *Id.* at \*21; *cf. Patel*, 165 T.C., slip op. at 25–26 (noting that the absence of a feasibility study indicated the lack of a substantial nontax purpose). Instead, the discussions between Mr. Sheperd and Mr. Cope focused solely on the tax benefits of the microcaptive arrangement and "various options Mr. Sheperd could use to 'get money out of the insurance company.'" *Royalty Mgmt.*, T.C. Memo. 2024-87, at \*14, \*26.

Third, the timing of the microcaptive transactions underscores the lack of a substantial nontax purpose. Sheperd Royalty maintained no insurance of any kind—not even a general business liability policy—during 2011. And it maintained no insurance of any kind during the first 11 months of 2012, by which time it had assigned $25 million worth of mineral leases to Cordillera or Apache. If Mr. Sheperd had been genuinely concerned about risk on the leases being assigned, one might have expected him to secure insurance against that risk before year-end 2012, at which point Sheperd Royalty had stopped acquiring leases. But

---

[4] The excessively high premiums Sheperd Royalty paid were not set by actuarial principles. *See Royalty Mgmt.*, T.C. Memo. 2024-87, at \*21–25, \*46–47. Although Mr. Rivelle's report was captioned an "Actuarial Study," it contained "no real 'actuarial analysis' at all" because his conclusions were baseless or founded on false premises. *Id.* at \*46–47. We concluded in *Patel* that the lack of actuarially determined premiums "undermine[d] the [taxpayers'] claim that they possessed a 'substantial purpose' for the transactions apart from [F]ederal income tax effects." *Patel*, 165 T.C., slip op. at 24–25.

[*9] there is no evidence that Mr. Sheperd, at any time during 2011 or 2012, made a meaningful search for commercially available insurance.

By year-end 2012 Sheperd Royalty had made a lot of money. It had garnered $24 million of gross receipts during the first ten months of the year, and Mr. Sheperd was looking at a very substantial tax liability. Seeking advice on how he might reduce his tax bill, he was referred to Mr. Cope, who offered the microcaptive arrangement as a tax-reduction strategy. In our prior opinion we found as a fact that Mr. Sheperd pursued the microcaptive arrangement at year-end 2012, not because he was genuinely concerned about title risk, but because he desired to reduce petitioners' tax liability. *Id.* at *10. We accordingly conclude that the Sheperds had no substantial purpose (apart from Federal income tax effects) for entering into the microcaptive arrangement.

III.  *Application of Penalties*

Section 6662(b)(6) imposes a 20% penalty on the portion of an underpayment of tax attributable to the disallowance of claimed tax benefits "by reason of a transaction lacking economic substance (within the meaning of section 7701(o))." In disallowing the deduction claimed for the purported premiums, the Notice of Deficiency issued to the Sheperds determined "that the purported insurance and/or reinsurance transactions lack economic substance." We have sustained that determination, concluding that the microcaptive arrangement lacked economic substance within the meaning of section 7701(o). We thus conclude here, as we did in *Patel*, that the claimed tax benefits were disallowed "by reason of" the lack of economic substance inhering in the microcaptive transactions. *See Patel*, 165 T.C., slip op. at 27–28. The penalty imposed by section 6662(b)(6) is thus applicable here.[5]

The final question is whether the penalty rate should be increased to 40% under section 6662(i) because the transaction lacking in economic substance was "nondisclosed." *See Oropeza v. Commissioner*, 155 T.C. 132, 140 (2020) ("[S]ection 6662(i) does not impose a distinct penalty. It simply increases the rate of the penalty imposed . . . for engaging in a transaction lacking economic substance."). Section 6662(i)(2) defines

---

[5] We previously determined that supervisory approval of the section 6662(b)(6) penalty was timely. *See Royalty Mgmt.*, T.C. Memo. 2024-87, at *50–51. In their Supplemental Memorandum petitioners advance a "reasonable cause" defense against the penalty, asserting that they reasonably relied on professional advice. But that defense is not available for penalties under section 6662(b)(6); thus, we need not address it here. *See* § 6664(c)(2).

[*10] the term "nondisclosed noneconomic substance transaction" to mean a transaction "with respect to which the relevant facts affecting the tax treatment are not adequately disclosed" in the return or in a statement attached to the return.

This Court recently considered what constitutes "adequate disclosure" under section 6662(i)(2). *See Patel*, 165 T.C., slip op. at 28–30. The Court explained that disclosure "must be sufficiently detailed to alert the Commissioner and his agents as to the nature of the transaction so that the decision as to whether to select the return for audit may be a reasonably informed one." *Id.* at 29 (quoting *Estate of Fry v. Commissioner*, 88 T.C. 1020, 1023 (1987)). While the taxpayer need not "recite every underlying fact," the disclosure "must be more substantial than providing a clue that would intrigue the likes of Sherlock Holmes." *Ibid.* (quoting *Highwood Partners v. Commissioner*, 133 T.C. 1, 21 (2009)).[6]

Sheperd Royalty filed a return on Form 1120S, U.S. Income Tax Return for an S Corporation, for 2012. In computing its net income, it claimed a deduction of $1,110,206 for "insurance" expenses. That figure included the $1,099,900 of premiums at issue here, but those premiums were not broken out separately as a distinct item. Apart from listing a deduction for "insurance," Sheperd Royalty's return disclosed no facts whatever—either in the return or in an attached statement—about the microcaptive insurance arrangement. Because Sheperd Royalty was a passthrough entity, the Sheperds reported their distributive shares of its income and deductions on Schedule E, Supplemental Income and Loss, included in their 2012 joint return. But their individual return likewise disclosed no facts about the microcaptive insurance arrangement.

"[M]ere declaration of a deduction does not entitle taxpayer to a reduced penalty . . . ." *Accardo v. Commissioner*, 942 F.2d at 453. Rather, "[t]o satisfy the disclosure requirement, the tax return must . . .

---

[6] *Accord, e.g.*, *Estate of Reinke v. Commissioner*, 46 F.3d 760, 765 (8th Cir. 1995) ("To satisfy the disclosure requirement, the tax return must at least provide sufficient information to enable the Commissioner to identify the potential controversy involved."), *aff'g* T.C. Memo. 1993-197; *Accardo v. Commissioner*, 942 F.2d 444, 453 (7th Cir. 1991) ("[M]ere declaration of a deduction does not entitle taxpayer to a reduced penalty . . . ."), *aff'g* 94 T.C. 96 (1990); *Schirmer v. Commissioner*, 89 T.C. 277, 285–86 (1987) (finding that merely listing income and expense items is insufficient); *Elliott v. Commissioner*, T.C. Memo. 1997-294, 1997 WL 351191, at *6 ("What is critical is whether the taxpayer adequately disclosed enough relevant data concerning the treatment of the item to alert the Commissioner to a potential controversy."), *aff'd*, 149 F.3d 1187 (8th Cir. 1998) (unpublished table decision).

**[\*11]** provide sufficient information to enable the Commissioner to identify the potential controversy involved." *Estate of Reinke v. Commissioner*, 46 F.3d at 765. Petitioners did not include, in their returns or in statements attached thereto, an iota of specific information about the microcaptive arrangement. We thus conclude here, as we did in *Patel*, 165 T.C., slip op. at 28–30, that the arrangement was not "adequately disclosed" within the meaning of section 6662(i)(2). We thus sustain the section 6662(b)(6) penalty at the 40% rate as determined by respondent.[7]

To reflect the foregoing,

*Decisions will be entered under Rule 155.*

---

[7] Petitioners err in contending that the arrangement was "adequately disclosed" on RMIC's 2012 Form 1120–PC, U.S. Property and Casualty Insurance Company Income Tax Return. On that return RMIC reported $252 of taxable investment income and indicated that $1,024,008 of "premium insurance income" had been excluded under section 831(b). That return disclosed no specific facts about the microcaptive arrangement, e.g., that RMIC was allegedly a reinsurer, that CCFC Insurance was the alleged insurer, or that Sheperd Royalty was the alleged insured. The only fact of conceivable relevance disclosed on RMIC's return was that Mr. Sheperd owned 100% of its stock. That was not "sufficient information to enable the Commissioner to identify the potential controversy involved." *See Estate of Reinke v. Commissioner*, 46 F.3d at 765.